UNITED STATES of America ex rel. Eddie ALLEN, Petitioner-Appellee,

v.

Charles J. ROWE et al., Respondents-Appellants.

No. 78–2140.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1978.

Decided Jan. 8, 1979.

392

Patrick J. Calihan, Asst. Atty. Gen., Crim. Justice Div., Chicago, Ill., for respondents-appellants.

Ralph Ruebner, Deputy State App. Defender and Randy K. Johnson, Asst. State App. Defender, Chicago, Ill., for petitioner-appellee.

Before SWYGERT, LAY * and PELL, Circuit Judges.

PER CURIAM.

This case presents the question whether a criminal defendant's Fifth and Fourteenth Amendment rights were violated when a state prosecutor was permitted at trial to cross-examine the defendant about his silence during police custody and to comment

---

* The Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

upon his silence before the jury during closing argument. We agree with the district court's conclusion that defendant-petitioner's rights were violated and affirm the court's order granting petitioner's motion for summary judgment, vacating the judgment of conviction, and remanding the case for a new trial.

Petitioner, Eddie Allen, was tried and convicted of murder in a jury trial in the Circuit Court of Peoria County. On June 21, 1974 Allen was sentenced to a prison term of eighteen to fifty years. The conviction was affirmed by the Illinois Appellate Court, Third Judicial District. *People v. Allen,* 37 Ill.App.3d 619, 346 N.E.2d 486 (1976). The Supreme Court of Illinois denied Allen's leave to appeal, and the United States Supreme Court denied his petition for a writ of certiorari. *Allen v. Illinois,* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 806 (1977).

Allen filed a petition for federal habeas corpus relief, 28 U.S.C. § 2254, in the United States District Court for the Southern District of Illinois, on February 8, 1978. On July 24, 1978 the district court granted Allen's request for habeas relief, and allowed the State of Illinois ninety days to either give Allen a new trial or release him. The State appealed the district court's order on August 16, 1978 and, on October 6, the district court stayed its July 24 order pending this appeal.

Allen shot and killed his wife on January 3, 1974. Allen called the police, and when an officer arrived and asked him what had happened, Allen answered, "I shot my wife." A few moments later, as he was being searched, Allen added that the gun was on a table in the house and that his wife was hurt "pretty bad." Allen was read his *Miranda* warnings and said nothing more. (These facts are described in more detail in Judge Morgan's Decision and Order which is attached as an appendix to this opinion.)

At trial, the prosecutor, in order to undermine Allen's self-defense theory of justification, cross-examined Allen about his silence in the wake of the shooting. Later, in his closing argument to the jury, the prosecutor argued that Allen's silence was inconsistent with his self-defense contention. The district court concluded that these prosecutorial actions violated the Fifth Amendment standards established in *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and that these violations did not constitute harmless error. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We agree, and adopt the thorough and well-reasoned decision of Judge Morgan.

AFFIRMED.

### APPENDIX

In The United States District Court
Southern District of Illinois
Northern Division

United States of America
    ex rel. Eddie Allen, *Petitioner,*

                    *v.*                    No. 78–1016

Charles J. Rowe, et al., *Respondents.*

### DECISION AND ORDER

Petitioner is presently a prisoner seeking the issuance of a writ of habeas corpus under the provisions of 28 U.S.C. § 2254. He is being held in state custody at the Pontiac Correctional Center, Pontiac, Illinois. He contends that he is confined unlawfully because his right to remain silent under the Fifth and Fourteenth Amendments to the United States Constitution was unlawfully denied him when the prosecutor was allowed to cross-examine petitioner about his silence during custody and to comment upon his silence before the jury during closing argument. This court has determined that under established law petitioner's constitutional right to remain silent was infringed, and that this infringement was not harmless error. Accordingly, petitioner's motion for summary judgment must be allowed, and respondent's motion to dismiss must correspondingly be denied.

Petitioner was tried and convicted of the murder of his wife, in a jury trial in the Circuit Court of Peoria County. A sentence

of imprisonment for a term of 18 to 50 years was imposed. Petitioner appealed his conviction to the Appellate Court of Illinois, Third Judicial District. *People v. Allen,* 37 Ill.App.3d 619, 346 N.E.2d 486 (1976). One of the issues raised on appeal was whether petitioner's constitutional right to remain silent was violated by the prosecutor's cross-examination and closing argument to the jury. In a split decision, the state Appellate Court held that petitioner's right to remain silent under the Fifth and Fourteenth Amendments had not been violated.

Subsequently, Allen petitioned for leave to appeal to the Supreme Court of Illinois and for a writ of certiorari in the Supreme Court of the United States. Both petitions were denied. 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 806 (1977). Thus, it appears that petitioner has exhausted his state judicial remedies and is properly before this court pursuant to the provisions of 28 U.S.C. § 2254.

I

There is no dispute about the fact that Allen shot and killed his wife. The shooting took place on January 3, 1974 at approximately 3 p. m. Following Allen's call to the police, Officer Terry Melloy of the Peoria Police Department was dispatched to investigate a shooting at the home of Margaret and Daniel Moore. Upon his arrival at the Moore residence, Officer Melloy was met at the sidewalk by Allen. Melloy testified that Allen appeared calm and showed no emotion whatsoever. When asked by the officer what happened, Allen replied, "I shot my wife." As the officer was patting him down for weapons, Allen told Officer Melloy that the gun was on a table inside the house and that his wife was hurt "pretty bad."

At this point, Allen and Officer Melloy entered the Moore house. The officer sat Allen down on a couch and assisted another officer in administering first aid to Mrs. Allen. While the other officer was attending to the victim, Officer Melloy read Allen his *Miranda* warnings, which included the admonishment that, "Anything you say can

and will be used against you in a court of law." Allen acknowledged that he understood his rights and said nothing further.

At trial, Allen relied on a self-defense theory of justification. During the prosecutor's cross-examination of Allen, the following colloquy took place, over objection of defense counsel, which colloquy serves as the basis for petitioner's Fifth Amendment claim:

"Q. [State's Attorney] Would you explain that information you gave to Officer Terry Melloy concerning your fears for you (sic) life and efforts of self defense when he came up to the house after you called?"

Defense counsel objected to this question; the objection was sustained and the jury was instructed to disregard it.

"Q. [State's Attorney] Now, Mr. Allen, when the police show (sic) up pursuant to your call on January 3, 1974, at 431 West 7th in Peoria, and you talked to Officer Melloy, you never mentioned any fear for your life did you?

DEFENSE COUNSEL: Same Objection.

THE COURT: Overruled.

A. Would you repeat the question?

Q. When the police showed up at 431 West 7th on January 3, 1974 pursuant to your call, you never told them you were in fear for your life from your wife did you?

A. No.

Q. In fact, you never told any law enforcement officer this did you?

A. No, I didn't.

Q. In fact, the first statements regarding this are from the stand in this trial aren't they?"

Out of the presence of the jury, defense counsel objected to this line of questioning on the ground that the prosecution may not permissibly comment about a defendant's refusal to make a statement, and moved the court to declare a mistrial. The objection was overruled and the motion for mistrial denied.

"Q. [State's Attorney] Would you repeat the question?

COURT REPORTER: In fact, the first statements regarding this are from the stand in this trial aren't they?

A. Yes.

Q. Now this King and Lemons that testified here, you never mentioned them before trial, did you?

A. No sir, I didn't."

The State's Attorney made the following statements to the jury during closing argument:

"Now, when by the way, did the defendant first say self-defense? Did he say this to officer Terry Melloy, I just shot my wife, I had to do it, she came at me with a knife in the kitchen! Did he say that? Did he say, she was going into her purse, I thought she had a gun, I had to shoot her! Or did he even say, I shot my wife in self-defense. No, none of those. He said very calmly, according to Officer Melloy, I just shot my wife, she is pretty bad, she is in there, the gun is on the table. In a calm way."

\* \* \* \* \* \*

"After he shot his wife five times and stood over her (indicating) and sent the hammer home on an empty cylinder, did he then say, oh my God, I had to do it, I thought she was going for a gun. No, what he said was, she's dead now. The defendant could not say self-defense because there was no self-defense. The defendant is a cold blooded, brutal murder (sic)."

The evidence relating to the events which occurred immediately prior to the fatal shooting consisted entirely of the conflicting testimony of Margaret Moore, Mrs. Allen's sister-in-law, and that of Allen himself.

Mrs. Moore testified on behalf of the State, that on the date of the incident, January 3, 1974, Allen and his wife were separated and Mrs. Allen was residing with the Moores. She testified that Mrs. Allen returned from work to the Moore home at approximately 3 p. m.; that Allen arrived a short time later; that upon Allen's arrival Mrs. Moore went to the bathroom to do some mopping, leaving the Allens alone in the living room so that they could have some privacy; that while in the bathroom with the door closed, she heard Mrs. Allen run past the bathroom toward the back door screaming that her husband had a gun.

Further, according to Mrs. Moore, Allen caught his wife at the back door, at which time Mrs. Moore heard a sound which she described as "A blow, sort of like a crash." She heard a scream, opened the bathroom door, looked out, observed that Mrs. Allen was bleeding from the back of her head, saw Allen with his right arm around his wife, and asked Allen to please let her go. He did, and Mrs. Allen went into the bathroom where Mrs. Moore washed the blood off from around the wound.

Mrs. Moore says she then suggested that Allen leave and come back later, but he refused. She described Allen's wife as being "kind of incoherent" at the time. Allen was asking a lot of questions and his wife was holding on to Mrs. Moore. A couple of minutes later all three went into the living room to talk things over. According to Mrs. Moore, Mrs. Allen did not take her coat and purse into the living room with her, she left them at the back door. Mrs. Allen sat in a chair and Allen squatted in front of her.

Mrs. Moore says she started to call her own husband from a telephone on the kitchen wall, a position from which she could see both Allen and his wife. Before she had completed her call, Mrs. Moore observed Allen shoot his wife five times with a handgun. She simultaneously saw Mrs. Allen attempting to rise from the chair and move toward the front door. After the last shot, she saw Allen take a step toward his wife, who was laying on the floor, and pull the trigger on the then empty weapon.

Allen turned to Mrs. Moore and said, "She is dead now. Call the police." Mrs. Moore was unable to make the call, so Allen called the police. Mrs. Moore testified that Allen told her to relax because he would not hurt her. She stated that she wanted to leave, but Allen wanted her to stay, saying, "No, I had to be his witness." Allen then

walked out the front door and met Officer Melloy.

Allen's version of what transpired at the Moore home is decidedly different from that of Mrs. Moore. Allen testified that he went to the Moore house to meet his wife to discuss a divorce. Upon his arrival, Mrs. Moore left Allen and his wife alone in the living room. When Allen informed his wife that he knew about the man with whom she was having an affair and their plan to kill him, she got excited, grabbed for her purse but missed it, ran to the kitchen and picked up a butcher knife. A struggle ensued, in which Mrs. Allen fell and struck her head against the kitchen door. Mrs. Allen called for Mrs. Moore, who came out of the bathroom. The two women went into the bathroom where Mrs. Moore washed the cut on Mrs. Allen's head.

Some conversation took place in the bathroom; then at Mrs. Allen's suggestion, all three went into the living room. Mrs. Allen sat down in a chair while her husband squatted on the floor in front of her. While Mrs. Moore went to use the telephone in the kitchen, Allen's wife told him she wouldn't be happy until he was dead and that if she got the chance she would kill him herself. Allen claims he reached into his coat pocket for a cigarette. His wife told him not to reach any further because she knew he had a gun. She reached into her purse and started to get up. At this point Allen remembered telling her to stop, then jumping up and shooting her. He said he did not remember firing the gun more than once, nor did he remember pointing the empty gun at his wife's body and pulling the trigger on the empty chamber. After the shooting Allen telephoned the police, whom he met outside shortly thereafter.

Allen testified that he thought his wife had a gun or knife and that when she started to get out of her chair and reached into her purse, he thought she was trying to kill him. He said he was "scared to death." According to Allen, he purchased the handgun for his protection because his wife threatened to have him killed. The evidence showed that Allen bought the handgun on December 29, 1973, and that he purchased bullets on January 3, 1974, shortly after his wife failed to show up for an appointment with their marriage counselor.

At trial the defendant called several witnesses to testify about events leading up to, and circumstances surrounding, the fatal shooting, in an attempt to show that he acted in self-defense. Testimony was presented indicating that each of the Allens had made prior death threats against the other. However, Mrs. Moore stated that she and Mrs. Allen had been close friends for seven years and that she did not know of any threats against Mrs. Allen's life by Eddie Allen prior to January 3, 1974.

Both Mr. and Mrs. Moore testified for the defense that several days prior to the fatal shooting, Mrs. Allen attacked her husband, first with a steak knife, then with a bottle. In substance, the Moores testified that Allen was visiting Mr. Moore at Moore's house in the early morning on December 30, 1973. Mrs. Allen and Mrs. Moore arrived there at approximately 3 a. m. An argument broke out between the Allens, and when Allen asked his wife where she had been, she became hysterical, grabbed a steak knife, and attacked her husband with it. Mr. Moore wrested the knife away from her. She then tried to hit Allen with a wine bottle. Once again Mr. Moore intervened, and took the bottle away. At this point Mrs. Allen threatened her husband, stating that she wished to see him dead.

Testimony was introduced showing that Mrs. Allen and Mrs. Moore had been out with two men (King and Lemons) on the evening of December 29, 1973. There is also some testimony that the two men told Mrs. Allen that if she desired, they would have Allen killed.

## II

Petitioner contends that the prosecutor's questions on cross-examination and his corresponding comments in closing argument impermissibly referred to petitioner's exercise of his Fifth Amendment right to remain silent. In support of his argument, petitioner relies chiefly on *United States v.*

*Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Respondent attempts to distinguish these cases and contends that the prosecutor's questions and comments were not improper comments on petitioner's silence, but, rather, were used to impeach petitioner's statements about his state of mind. Specifically, respondent argues that the prosecutor attempted to impeach Allen's claim that he shot his wife because at the time he was "scared to death" of her, and thereby show that Allen's claim of self-defense was actually a recent fabrication.

*United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), is factually similar to the case at bar. Hale was tried and convicted of robbery. During cross-examination at trial, the prosecutor asked Hale why he had not given the police his alibi when he was questioned shortly after his arrest. The Supreme Court held that Hale's silence during police interrogation lacked significant probative value, and that any reference to his silence under such circumstances carried with it an intolerably prejudicial impact, thereby entitling Hale to a new trial. *Hale* was decided in the exercise of the Supreme Court's supervisory powers over lower federal courts. The court therefore did not reach the constitutional question involved.

The Supreme Court did subsequently reach the constitutional issue in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The specific question presented in *Doyle* was whether a state prosecutor may attempt to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of arrest. The Supreme Court held that it would be fundamentally unfair and a deprivation of due process to allow the arrested person's post-arrest silence to be used to impeach an explanation subsequently offered at trial. The court did, however, leave open the question of whether the use of a defendant's silence in this manner could, in some instance, constitute harmless error.

Respondent attempts to distinguish both *Hale* and *Doyle* by the fact that each of these cases involved cross-examination about the defendant's silence after the time of arrest and after each had received *Miranda* warnings. In the present case, however, according to respondent, Allen voluntarily made incriminating statements to the police prior to arrest or any *Miranda* warnings. These "volunteered statements" consisted of Allen's statement to Officer Melloy, "I shot my wife," as well as the statements about the gun being on the table inside, and about his wife being hurt "pretty bad."

The prosecution argued to the jury that these statements were inconsistent with Allen's claim at trial that he was "scared to death" because he thought his wife had a gun or knife in her purse. Thus, respondent argues that having opened the door to the question of his state of mind, petitioner cannot prevent the prosecutor from trying to impeach petitioner's credibility by cross-examining him about the inconsistency between his pre-trial and trial statements.

Respondent's argument must be rejected. It is apparent that the prosecutor did not attempt to impeach Allen with what he *told* the police officer. Instead, he impeached Allen with what he *did not tell* the officer. The prosecutor's questions on cross-examination were clearly designed to emphasize Allen's failure to tell police that he acted in self-defense. (See quotation, *supra.*) Moreover, petitioner's statement that "I shot my wife" is not inconsistent with a claim of self-defense. Nor are the statements that the gun is lying on a table inside or that petitioner's wife was pretty badly hurt inconsistent with petitioner's theory. The inconsistency, if there is one, is in what Allen failed to say.

Essentially, respondent argues that because Allen admitted to the police that he shot his wife, his failure to include in his statement his reason for the shooting was an omission that could be used for impeachment. Had Allen remained com-

pletely silent, there is no question but that the prosecution would have been prohibited from using his silence to impeach his testimony that he acted in self-defense. But a person under arrest does not have to refrain from saying anything in order to preserve his Fifth Amendment rights. It is his privilege to stop at any time during custodial interrogation to assert his rights. *People v. Robinson,* 44 Ill.App.3d 447, 3 Ill.Dec. 43, 45, 358 N.E.2d 43, 45 (1976). By telling Officer Melloy that he shot his wife, Allen was merely stating the obvious, and he may not be held to have waived or forfeited his Fifth Amendment rights by this admission.

The prosecutor's questions relating to Allen's silence were not limited to Allen's failure to claim self-defense either before, at the time of, or after his "volunteered" statements to police. Rather, the questions were framed broadly (e. g., "In fact, you never told any law enforcement officer this [that you were in fear of your life] did you?" . . . "In fact, the first statements regarding this are from the stand in this trial aren't they?") so as to elicit a response concerning petitioner's failure to claim self-defense, both before and after he had been formally arrested and advised of his constitutional right to remain silent.

Thus, in the present case, just as in *Hale,* the petitioner was forced to admit on cross-examination that he had not offered exculpatory information to police at the time of his arrest. As the Supreme Court said in *Hale:*

> "A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness. As a preliminary matter, however, the court must be persuaded that the statements are indeed inconsistent. 3A J. Wigmore, Evidence § 1040 (J. Chadbourn rev. 1970) . . . . If the Government fails to establish a threshold inconsistency between silence at the police station and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded.

> "In most circumstances silence is so ambiguous that it is of little probative force."
>
> \* \* \* \* \* \*
>
> "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest." 422 U.S. 171, at 176, 180, 95 S.Ct. at 2136, 2138.

Allen's silence, alone, certainly was not inconsistent with his claim of self-defense at trial. His silence, even when coupled with the admission that he killed his wife, is still reasonably consistent with his defense at trial. Silence at the time of arrest may be inherently ambiguous, even apart from the effect of *Miranda* warnings, for in a given case there may be several explanations for silence that are consistent with the existence of an exculpatory explanation. *Doyle v. Ohio,* 426 U.S. 610 at 617–618, n. 8, 96 S.Ct. 2240 n. 8, 49 L.Ed.2d 91 (1976), citing *United States v. Hale,* 422 U.S. 171, at 177, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). When coupled with *Miranda* warnings, every post-arrest silence is insolubly ambiguous, because the arrestee's silence may be nothing more than his exercise of the right to remain silent. *Doyle v. Ohio,* 426 U.S. 610 at 617, 96 S.Ct. 2240, 49 L.Ed.2d 91. Therefore, Allen's silence can as easily be interpreted as indicating reliance on his right to remain silent as to give rise to the inference that the explanatory testimony was an interim fabrication.

The court rejects respondent's argument that the present case is distinguishable from *Hale* and *Doyle* in that Allen's silence is not a post-arrest silence, nor a silence occurring after *Miranda* warnings. As previously noted, the prosecutor's questions

were not limited to Allen's pre-arrest silence or silence prior to the reading of *Miranda* warnings, and thereby impermissibly referred to Allen's silence after the *Miranda* warnings were given. Apart from this fact, however, the prosecutor's questions and comments relating to Allen's silence prior to *Miranda* warnings were also improper.

The distinction between silence occurring prior to and silence occurring after *Miranda* warnings was rejected in *United States v. Impson,* 531 F.2d 274 (5th Cir. 1976). In *Impson,* the Court of Appeals for the Fifth Circuit noted that:

"The contention is that practically *Miranda* warnings tend to inhibit speech and that silence after such warnings is less inconsistent with innocence than silence in the absence of such warnings. This argument conflicts with the whole purpose and policy of *Miranda* by rewarding the police for failure to inform an accused person promptly upon his arrest of his right to remain silent. Silence is the right of the innocent as well as of the guilty. *Helton v. United States,* Note 3, *supra.* [221 F.2d 338, 341–342 (5th Cir. 1955)]. In the face of the numerous legitimate reasons for an arrested person to elect to remain silent we decline to attempt an enumeration of instances in which silence by an arrested person may be of probative value to the government's case. We discern no merit in the appellee's argument that silence in the absence of *Miranda* warnings raises a greater inference of guilt than silence following such warnings." [footnote 3 omitted] (531 F.2d 274 at 277)

The Fifth Circuit reaffirmed this principle in the recent case of *United States v. Henderson,* 565 F.2d 900 (5th Cir. 1978), a case involving prosecutorial questioning and comment about a defendant's silence occurring prior to arrest and prior to any *Miranda* admonitions. The principles and rationale set forth in *Impson* and *Henderson, supra,* are applicable with equal force to the present case. Therefore, the prosecutor's questions and comments about Allen's si-

lence, occurring before arrest or any *Miranda* admonitions, were also improper. *United States v. Impson,* 531 F.2d 274 (5th Cir. 1976); *United States v. Henderson,* 565 F.2d 900 (5th Cir. 1978).

The court deems *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), to be controlling here.

### III

Respondent argues that even if the prosecutor's questions and comments were constitutionally impermissible, any error which resulted was harmless. The Supreme Court in *Doyle v. Ohio,* 426 U.S. 610 at 619–620, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) specifically left open the question as to whether prosecutorial comment on a defendant's silence might be harmless error. The language used in *Doyle* strongly suggests that the Supreme Court might have employed the harmless error standard in that case, had the argument been asserted. *See* 426 U.S. 610 at 619–620, 96 S.Ct. 2240, 49 L.Ed.2d 91. To date, two circuits have applied the harmless error doctrine to cases falling under *Doyle,* and have found the error occurring therein to be harmless. *See Chapman v. United States,* 547 F.2d 1240 (5th Cir. 1977), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Meeks v. Havener,* 516 F.2d 902 (6th Cir. 1975) (per curiam), *vacated and remanded,* 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976), *on remand,* 545 F.2d 9 (6th Cir. 1976).

It is well settled that before a federal constitutional error can be held to be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18 at 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Thus, the question becomes whether there is a reasonable possibility that the error complained of might have contributed to the conviction. *Fahy v. Connecticut,* 375 U.S. 85 at 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). In making this determination, it is immaterial that there was sufficient evidence which the petitioner could have been convicted without the evidence complained of. 375 U.S. 85 at 86, 84 S.Ct. 229.

In each of the cases in which a *Doyle* violation was held to constitute harmless error, the prosecutor asked only one question eliciting the fact of the defendant's silence. Neither in cross-examination nor in closing argument did the prosecutor suggest that silence impeached the defendant's trial testimony. In the present case, by contrast, the prosecutor asked a short series of questions on cross-examination relating to Allen's silence. The questions were designed specifically to elicit this fact and, because of it, to lead the jury to infer that Allen's claim of self-defense was merely a recent fabrication. In both cross-examination and closing argument, the prosecutor suggested that the petitioner's silence impeached his claim of self-defense.

Although there is certainly sufficient evidence in the record to support petitioner's conviction, petitioner's self-defense claim cannot be said to be transparently frivolous. This is particularly true in light of his wife's prior knife attack on him several days earlier and the evidence regarding prior death threats. In explaining the use of the harmless error rule in cases in which a *Doyle* violation is involved, the Fifth Circuit Court of Appeals stated that:

> "When the prosecution uses defendant's post-arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous." *Chapman v. United States,* 547 F.2d 1240, at 1249 (5th Cir. 1977), *cert. denied,* 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977).

The jurors in Allen's trial may have been persuaded by the improper cross-examination and argument to conclude that if Allen had reasonably believed his life was in danger and that his wife was reaching for a weapon, he would have told this to the police. Therefore, the court cannot conclude that the error was harmless beyond a reasonable doubt, *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and Allen is entitled to a new trial.

Accordingly, IT IS ORDERED that petitioner's motion for summary judgment is ALLOWED, the judgment of conviction is VACATED, and the case is REMANDED to the Circuit Court of Peoria County, to allow the State of Illinois a period of 90 days from the date of this order to afford Allen a new trial, failing which Allen is entitled to his release.

IT IS FURTHER ORDERED that respondent's motion to dismiss is DENIED.

Entered July 24, 1978

> /s/ Robert D. Morgan
> United States District Judge