**Douglas G. DEAN, Petitioner,**

**v.**

**Thomas ISRAEL and Bronson C. LaFollette, Respondents.**

**Civ. A. No. 77–C–366.**

United States District Court,
E. D. Wisconsin.

June 4, 1981.

---

**480**

Dennis P. Coffey, Coffey & Coffey, Milwaukee, Wis., for petitioner.

Bronson C. LaFollette, Atty. Gen., and Edward S. Marion and Jerome S. Schmidt, Asst. Attys. Gen., Madison, Wis., for respondents.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

The petitioner Douglas G. Dean was convicted in Sheboygan County Court on November 21, 1971, of five counts of first degree murder, in violation of § 940.01, Wis.Stats., and sentenced to five consecutive terms of life imprisonment. The victims were the petitioner's mother, Mrs. Dean; his girl friend's mother, Mrs. Rammer; and his girl friend's three brothers. The convictions were affirmed on appeal to the Wisconsin Supreme Court. *State v. Dean*, 67 Wis.2d 513, 227 N.W.2d 712 (1975). The evidence presented at trial is described in detail in that decision. See 67 Wis.2d at 517–526, 227 N.W.2d 712. Presently pending before this court is Dean's petition for a writ of habeas corpus, which petition will be granted.

Dean raises seven grounds in support of his petition:[1] (1) that the prosecution was permitted to ask questions at trial on the petitioner's refusal to answer questions during the investigatory phase of the case without his attorney being present and on the fact of his having retained counsel; (2) that in view of the extensive pretrial publicity about the case, the voir dire was insufficient to protect the petitioner's right to an impartial jury; (3) that the prosecution introduced prejudicial inadmissible hearsay, i. e., statements made by Mrs. Dean, one of the victims, to a third party about her relationship with the petitioner; (4) that the prosecution introduced evidence of other criminal conduct not related to this case and for which the petitioner had never been convicted; (5) that the prosecution asked certain questions implying the existence of evidence not subsequently introduced; (6) that the petitioner had ineffective assistance of counsel; and (7) that the sentence imposed constitutes cruel and unusual pun-

---

1. Recently petitioner also sought leave to amend his petition to add a challenge under *Sandstrom v. State of Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), to the presumption of intent instruction given to the jury. The Court denied the request on exhaustion grounds. By letter dated April 10, 1980, petitioner advised the court that he had applied to the Sheboygan County Circuit Court for postconviction relief on the *Sandstrom* issue, and his motion was denied. In view of this Court's grant of the writ on other grounds, however, it declines to consider the *Sandstrom* issue, but see *Harris v. Israel*, 515 F.Supp. 568 (E.D.Wis.1981).

ishment. The Court will consider each ground separately below.

(1) *USE AT TRIAL OF PETITIONER'S REFUSAL TO ANSWER QUESTIONS WITHOUT THE PRESENCE OF HIS ATTORNEY AND OF HIS HAVING RETAINED COUNSEL*

Douglas Dean was discovered in a dazed condition approximately six miles outside of the City of Sheboygan, Wisconsin, at 12:15 P.M. on Monday, July 19, 1971. The five murders for which he was charged had occurred in Sheboygan during the night of July 18–19, 1971. Dean was taken by ambulance to a hospital where he remained under police guard. On Thursday, July 22, 1971, he was formally charged with the murders. Upon his arrival at the hospital on Monday, July 19, 1971, Dean was found to be under the influence of LSD, which is an hallucinogenic-type drug, and his defense at trial was that he had unwittingly taken LSD around midnight on the night of July 18–19, had no memory of the subsequent events of that night, and had been incapable of forming the requisite intent to commit first degree murder.

Dean testified at trial, and during his cross-examination the following exchange took place:

"A. A nurse was talking to me but I don't know when.

"Q. Do you know what she asked you.

"A. I think somebody asked me where I was.

"Q. What did you tell her.

"A. I think I said a hospital.

"Q. Do you recall an attorney coming to visit you shortly after that.

"A. I recall what I thought was an attorney standing—.

"Q. Recall how many times did you see that attorney before that day.

"A. I think a couple times.

"Q. And he asked you if you recognized him.

"A. I think he did. Yes.

"Q. And you told him yes.

"A. Yes.

"Q. And he asked you what his name was.

"A. Yes, I believe he did.

"Q. And you told him what his name was.

"A. I had to think but I remembered.

"Q. You remembered. And you were correct in his name, were you not.

"A. I guess so.

"Q. You refused to talk to doctors in the hospital without the presence of your attorney, isn't that right.

"ATTY. HALVORSEN: I'm going to object to that. That's not the fact. There is no evidence in the case of that.

"ATTY. AXEL: I have a right to ask him on it.

"THE COURT: It's proper cross examination. He may answer.

"A. What was the question.

"ATTY. AXEL:

"Q. You refused to talk to a doctor in the hospital without your attorney being present. Isn't that a fact.

"A. I couldn't say for sure. I am inclined to say no.

"Q. You remember Dr. Jochimsen coming in and talking to you or wanting to talk to you.

"A. I recall Dr. Jochimsen.

"Q. Didn't you tell him you wouldn't talk to him unless your attorney was present.

"A. Yes. [Tr. at 743–745.]

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now you had attorneys representing you from Monday afternoon on, is that correct.

"A. That I could not say.

"Q. Well, you recall that an attorney came to you on Monday afternoon and asked you if you recognized him and you told him who he was, didn't you.

"A. Yes, I did.

"Q. And from that time on you had an attorney representing you.

"A. That I do not know.

"Q. What.

"A. That I do not know.

"Q. You don't recall of your attorney being in your hospital room on Tuesday morning.

"A. I recall him being there Tuesday morning.

"Q. You do recall talking to your attorney on Tuesday or Wednesday.

"A. That I recall.

"Q. And on Thursday.

"A. I believe I did. Yes.

"Q. So you knew why the attorneys were there, did you not.

"A. Not initially.

"Q. What.

"A. Not initially.

"Q. When did you find out why the attorneys were there.

"A. The day they told me that my mother and the Rammers had been killed.

"Q. So that you believe was on Wednesday.

"A. I think so. Yes." [Tr. at 747–748.]

On redirect examination, Dean's attorney questioned him as follows:

"Q. And when Dr. Jochimsen came to your room you didn't talk with him.

"A. When he came to my room he identified himself as Dr. Jochimsen and at that time I believe I wasn't sure if I should speak to him or not.

"Q. Why.

"A. Well, I was just under the impression I wasn't supposed to talk to anyone.

"Q. Who had given you that impression.

"A. My attorney." [Tr. at 763–764.]

Dr. Larry Malewiski, one of Dean's treating physicians at the hospital, was subsequently called as a defense witness, and on cross-examination was asked one question by the prosecutor about Dean's giving a medical history after he had already retained and talked to an attorney. (Tr. at 797.) Dean's sister, Constance Schneider, was also called as a defense witness and was cross-examined by the prosecutor about her reason for hiring an attorney for Dean soon after she learned about her mother's murder and Dean's hospitalization. (Tr. at 836–840 and 842–843.) The exchange between the prosecutor and the witness (Dean's sister) was in part as follows:

"Q. After you found out from the Sheriff's Department that they found your brother at Six Corners and after you observed that your mother had been shot you went home and contacted an attorney and told him to go right over to the hospital and see Douglas, didn't you. [Tr. at 836.]

\*     \*     \*     \*     \*     \*

"Q. After you realized she had died from some sort of violence you retained an attorney and told him to go over to St. Nicholas Hospital and take care of Douglas. Or you had somebody call your attorney for you.

"A. Driving over my mind was very blank, driving back to my house, and I wasn't thinking anything and then I remembered Douglas. I had not connected Douglas with my mother, unreasonable as that sounds. That's how my mind worked and I had been completely blank and then I remembered Douglas and I could figure out what everybody else would think so when I realized that I would have to get a lawyer for my brother.

"Q. If he was hurt he also needed a doctor. Did you call the doctor.

"A. When the woman called from the Sheriff's Department she told me he was at the hospital already so I figured there was a doctor there.

"Q. You figured because your brother was hurt he needed an attorney.

"A. No, sir.

"Q. Why did you think he needed an attorney.

"A. Because he was—he had been picked up by the police and I connected what other people would assume.

"Q. I see. And what would other people assume.

"A. That he had been involved in this in some way. [Tr. at 839–840.]

\* \* \* \* \* \*

"Q. You didn't want the police to talk to your brother without an attorney, and you state that you had an experience about that with the Debbie Westenberger matter.[2] What was that experience.

"A. The detectives took my brother away and grilled him for quite a few hours.

"Q. Were you there.

"A. No, sir.

"Q. You don't know how long they talked to him, do you.

"A. No, I only know what my brother and father said.

"Q. Of your own knowledge you don't know how long they talked to him.

"A. No.

"Q. The fact of the matter is, that at that time he was associating with Debbie Westenberger who was 16 years old.

"A. Yes.

"Q. The fact of the matter further is she was pregnant at that time. Is that right.

"A. I never knew that.

"Q. You never knew that.

"A. No.

"Q. And she was found in your brother Douglas's bedroom at your parents' home suffering from a gunshot wound. Is that right.

"A. Yes.

"Q. The gun that was lying on the bed next to her was Douglas's gun, wasn't it.

"A. Yes.

"Q. And she finally was taken to the hospital and died at the hospital.

"A. Yes.

"Q. The police questioned Douglas as to what had happened.

"A. Yes.

"Q. Other than that did anything happen.

"A. No." [Tr. at 842–844.]

The testimony set forth above was admitted at trial in violation of Dean's rights under both the Fifth and the Sixth Amendments to the United States Constitution. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held that a defendant's Fifth Amendment right to remain silent is violated when he is questioned at trial about his exercise of that right during a custodial interrogation where the purpose of the questioning is to create the inference that the defendant would have talked had he not been guilty. See also *Rudolph v. Powell,* 478 F.Supp. 849 (E.D.Wis.1979). Such questioning is permissible to rebut a defendant's claim that he had previously told the police the same exculpatory story which he told at trial, or his claim that he had no opportunity to explain his behavior upon arrest, *United States v. Mavrick,* 601 F.2d 921 (7th Cir. 1979), but it is not admissible to impeach the substance of the defendant's exculpatory trial testimony. *Charles v. Anderson,* 610 F.2d 417, (6th Cir. 1979); *United States ex rel. Allen v. Rowe,* 591 F.2d 391 (7th Cir. 1979); *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). In order to avoid rewarding police for their failure to notify a defendant promptly of his suspect position and to give him the *Miranda* warnings, the *Doyle* prohibition extends to questioning which occurs prior to the defendant's being given his *Miranda* warnings and prior to his formal arrest. *United States ex rel. Allen v. Rowe,* supra; *United States v. Impson,* 531 F.2d 274 (5th Cir. 1976), cert. granted, vacated and remanded 422 U.S. 1031, 98 S.Ct. 900, 54 L.Ed.2d 803 (1975), on remand 535 F.2d 286 (1976); *United States v. Henderson,* 565 F.2d 900 (5th Cir. 1978); *People v. Conyers,* 49 N.Y.2d 861, 427 N.Y.S.2d 798, 404 N.E.2d 1339 (N.Y.Ct.App., 1980).

**2.** There was other testimony at the trial that in 1968 Dean's girl friend, Debbie Westenberger, committed suicide in his bedroom, using his gun. Dean was questioned by police in connection with her death and was released. No charges were brought against him.

■ The respondents in this case argue that Dean was not in custody during the time about which he was questioned, and that he was questioned about his refusal to answer questions put to him by a doctor and not by the police. The first point is without merit. Although Dean was not formally charged until Thursday, July 22, 1971, he was placed under police guard at the hospital on Monday, July 19, 1971, as soon as the police learned of his mother's and the Rammers' deaths, and was thereafter continuously guarded. As for the second point, the evidence was introduced for the purpose of showing Dean's guilty knowledge and impeaching his exculpatory story that he had taken LSD around midnight on July 18–19, remained under its effects throughout that night, and therefore was without memory of the events of that night, rather than, as the prosecution claimed, having taken the LSD shortly before noon on July 19, long after the murders had been committed, in order to manufacture a defense. In *Doyle v. Ohio*, supra, 426 U.S. at 619, 96 S.Ct. at 2245, the Court, quoting from Mr. Justice White's concurrence in *United States v. Hale*, 422 U.S. 171, 182–183, 95 S.Ct. 2133, 2139–2140, 45 L.Ed.2d 99 (1975), stated:

"'* * * it does not comport with due process to permit the prosecution during the trial to call attention to his [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony....
* * * "

In *United States ex rel. Allen v. Rowe*, supra, at 399, the Seventh Circuit, quoting from *United States v. Impson*, supra, 531 F.2d at 277, extended the *Doyle* rationale to silence occurring prior to *Miranda* warnings:

"'* * * Silence is the right of the innocent as well as of the guilty. [Citation omitted.] In the face of the numerous legitimate reasons for an arrested person to elect to remain silent we decline to attempt an enumeration of instances in which silence by an arrested person may be of probative value to the government's case. We discern no merit in the appellee's argument that silence in the absence of *Miranda* warnings raises a greater inference of guilt than silence following such warnings.'"

The defendant in the *Allen* case, whose petition for a writ of habeas corpus was granted, had been questioned about his failure to offer exculpatory evidence after a murder had been committed but prior to his formal arrest. Similarly in this case Dean, though technically not under arrest, was a suspect during the time about which the prosecution questioned him. The prosecution, therefore, could not use his silence nor his attorney's advice to him to remain silent for the purpose of impeaching his trial testimony.

■ The prosecutor also questioned Dean and Dean's sister about his sister's hiring of an attorney for him as soon as she heard of her mother's murder. A defendant may not be questioned about his retention of counsel, for the exercise by a defendant of a constitutional right, in this case his Sixth Amendment right to counsel, may not be used to raise an inference of guilt or to cause a jury to disbelieve the defendant's version of events. *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3d Cir. 1973), cert. denied 414 U.S. 855 (1973); *United States v. Williams*, 556 F.2d 65 (D.C. Cir.1977), cert. denied 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977; *United States v. Liddy*, 509 F.2d 428, 443–445 (D.C.Cir. 1974) (en banc), cert. denied 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).

■ Under the circumstances of this case, the errors described above were not harmless. In *United States ex rel. Allen v. Rowe*, supra, at 399, the Court stated:

"It is well settled that before a federal constitutional error can be held to be harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18 at 24, 87 S.Ct. 824 [828], 17 L.Ed.2d 705 (1967). Thus, the question

becomes whether there is a reasonable possibility that the error complained of might have contributed to the conviction. *Fahy v. Connecticut*, 375 U.S. 85 at 86–87, 84 S.Ct. 229 [230], 11 L.Ed.2d 171 (1963). In making this determination, it is immaterial that there was sufficient evidence which the petitioner could have been convicted without the evidence complained of. 375 U.S. 85 at 86, 84 S.Ct. 229 [230]."

The burden of proof is on the prosecution to establish harmless error, and in this case the respondent has failed to demonstrate that there is no reasonable possibility that the erroneous testimony contributed to Dean's conviction.

I have read the full transcript of the trial, and despite the circumstantial nature of much of the prosecution's proof, I am convinced that the evidence of guilt is overwhelming. It leaves little room, if any, for doubt that the petitioner committed the murders. His gun was used for all five murders, one of his friends and the petitioner himself testified that prior to the murders petitioner had stated his plan to kill his mother and his girl friend's mother for the inheritances (Tr. at 467–468, 478–479, 481, 484, 679–680, and 755–759), two inmates of the Sheboygan County Jail testified that after the murders the petitioner admitted shooting at least one person (Tr. at 515–516, 530, 996, 1003–1004, and 1015–1016), there was no other known connection between the Rammer family and Mrs. Dean except Douglas, and the petitioner's explanation that he was under the influence of LSD is without merit.

The jury was called upon to decide whether or not Dean committed the murders and whether or not he knew what he was doing if he did it. His theory of the defense was that he had unwittingly taken LSD prior to the murders and could not remember and was not legally responsible for the events of the night. To counter Dean's theory, the prosecution introduced relevant and properly admissible evidence about his prior familiarity with drugs and the medical improbability of his having taken the LSD when he claimed or of its

having affected him in the manner claimed. (See, e. g., Tr. at 906, 917–918, 925–929, 939–945, 948, and testimony of Dr. Rodrigo Munoz commencing at page 964.) The prosecution also attempted to counter Dean's theory of the defense by impeaching him through questioning on his exercise of his rights to remain silent and to retain counsel, which should not have been done.

The Seventh Circuit pointed out in *United States ex rel. Allen v. Rowe*, supra, at 400, "[i]n each of the cases in which a *Doyle* violation was held to constitute harmless error, the prosecutor asked only one question eliciting the fact of the defendant's silence." See *Chapman v. United States*, 547 F.2d 1240 (5th Cir. 1977), cert. denied 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Meeks v. Havener*, 516 F.2d 902 (6th Cir. 1975) (per curiam), vacated and remanded 428 U.S. 908, 96 S.Ct. 3215, 49 L.Ed.2d 1213, on remand 545 F.2d 9 (6th Cir. 1978). Compare *United States v. Impson*, supra (single question to arresting officer and curative instruction by the court); *Charles v. Anderson*, supra (five questions to defendant); *United States v. Henderson*, supra (prosecutor's comments during closing argument); *United States ex rel. Smith v. Rowe*, 618 F.2d 1204 (7th Cir. 1980) (prosecutor's comments during closing arguments, as noted in the opinion at 1207: "We see no legal distinction between the comments by the prosecutor to the jury and any attempt he might have undertaken to impeach petitioner * * * on cross-examination."); *United States ex rel. Allen v. Rowe*, supra (short series of questions to defendant).

In this case the prosecutor asked extended series of questions about the petitioner's silence on advice of his attorney with regard to his medical history, and the line of questioning was "designed specifically to elicit this fact [of silence] and, because of it, to lead the jury to infer that * * * [the defense] was merely a recent fabrication." *United States ex rel. Allen v. Rowe*, supra, at 400. The error was emphasized by the trial court's overruling of a defense objection to the line of questioning, thus giving

"the impression that the testimony could indeed be given probative value," which compounded the error committed by the prosecution. *Rudolph v. Powell*, 478 F.Supp. 849, 852 (E.D.Wis.1979). Even if a defendant's exculpatory story is transparently frivolous, as indeed it seems in this case, the error committed by the prosecutor in using the defendant's silence to impeach the story is not harmless. *Chapman v. United States*, supra, at 1249; *United States ex rel. Allen v. Rowe*, supra, at 400.

■ As for the prosecutor's questioning of Dean and his sister about the retention of counsel for Dean, it was both lengthy and repeated. Thus, it can reasonably be expected to have created an inference of guilt in the minds of the jurors solely as a result of Dean's exercise of a right guaranteed to him by the Constitution. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Dean's credibility was crucial to his defense of lack of intent and lack of recollection of the events of the night when the murders occurred. The impermissible questioning standing by itself may have caused the jury to disbelieve his version of events.[3] Therefore, I cannot find that "there is [not] a reasonable possibility that [it] * * * might have contributed to the conviction," *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), and the error was not harmless. *United States ex rel. Macon v. Yeager*, supra, at 616–617. The Court recognizes that some of the impermissible questioning was directed not at the petitioner but at his sister. Nevertheless, where the prosecutor's intent was to show the petitioner's guilt and where his questioning had that effect, the source of the testimony is irrelevant. *United States ex rel. Smith v. Rowe*, supra, at 1212; *United States v. Williams*, supra, at 67.

## (2) *THE VOIR DIRE*

The petitioner contends that the trial court's refusal to permit individual questioning and sequestration of potential jurors during the voir dire denied him his right to trial by an impartial jury because of the possibility of taint due to extensive pretrial publicity. The contention is without merit under the circumstances of this case.

The granting of a continuance, the granting of a change of venue, and the questioning of prospective jurors during the voir dire are the three standard methods available for dealing with the problem of adverse pretrial publicity. *United States v. Stanford*, 589 F.2d 285, 299 (7th Cir. 1978), cert. denied, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244. The method which should be employed in a particular case depends upon the circumstances of that case. *Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). In *United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), cert. denied 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706, an appeal from a highly publicized trial, the court of appeals considered whether the trial court had erred in refusing a defense request for questioning of each venireman out of the presence of the others and concluded that it had not, but that it had erred in asking only a general question regarding the jurors' ability to decide the case fairly and impartially without specifically inquiring into their exposure to pretrial publicity:

> " * * * This broad question should not be relied on in a situation where there is a probability of exposure. In contrast, in all the Supreme Court cases mentioned above, the trial court inquired specifically into pretrial publicity. [Citations omitted.]" 472 F.2d, at 375.

Specific inquiry, however, does not equate with sequestered individual inquiry:

> "This court has not required that jurors be individually questioned about exposure to pretrial publicity, e. g., *United States v. Cook*, 432 F.2d 1093 (7th Cir., 1970) cert. denied 401 U.S. 996, 91 S.Ct. 1224, 28

---

**3.** Dean also testified that he was acting on advice of counsel on Tuesday, July 20, 1971, which is prior to the time when he claimed to have learned of the murders. Questioning as to his consulting an attorney on that day, therefore, may have caused the jury to disbelieve that he had no recollection of the murders.

L.Ed.2d 535 (1971), in contrast to such requirement where there has been exposure to publicity during trial. *Margoles v. United States*, 407 F.2d 727 (7th Cir., 1969) cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). * * * " 472 F.2d, at 371 n. 45.

The Court concluded:

"Finally, contrary to the government's argument, it is undoubtedly possible to question the prospective jurors about pretrial publicity without exposing other members of the venire to the publicity. The procedure of individual questioning recommended by the American Bar Association, Standards Relating to Fair Trial and Free Press § 3.4 (Approved Draft, 1968), is of course one method. But even without individual questioning, the court could probe the impact of pretrial publicity without requiring the veniremen to describe what they had heard." 472 F.2d at 376–377.

■ The petitioner's trial was not preceded by "tremendous" inflammatory publicity adverse to him, nor was the publicity of a nature to arouse "deep and bitter prejudice" against him in the community. See 472 F.2d at 374–375. Petitioner does not challenge the characterization made by the Wisconsin Supreme Court of the pretrial publicity:

" * * * The press reports which had been made part of the record on this appeal are free from details of incriminating evidence against the defendant. There was one isolated story on August 5, 1971, which revealed that the defendant had purchased the murder weapon in May of 1970; * * *.

" * * * This case naturally produced a great deal of local publicity. However, it is the nature and the content of the publicity which must be considered. There were no editorials prejudicial to the defendant. The news stories were straight and factual and not incendiary. * * * " *State v. Dean*, 67 Wis.2d 513, 527, 227 N.W.2d 712 (1975).

Furthermore, in this case, in contrast to the trial court's handling of the voir dire in *Dellinger*, the judge made an extensive inquiry directed specifically at the effects of the pre-trial publicity. (See transcript of the voir dire at 16–35, 37–38, and 65–66.) He informed the members of the jury that he would question them about their knowledge of the case and about whether they had formed an opinion on the case, cautioned them not to reveal what they had heard or read and not to state what their opinions were, and then asked all the jurors whether they had heard of or read about the case. He questioned individually, but in the presence of the full jury panel, each juror who answered "yes," and he excused each juror who, upon individual questioning, stated that he or she had formed an opinion about the case. No juror was asked to describe what he had heard or read or to state what his opinion was. The defendant's counsel was then given a full opportunity to ask further questions of the jurors who had heard of or read about the case but who were not excused because they stated that they had formed no opinion on the case. He made extensive use of the opportunity provided. This procedure was fully consistent with the Seventh Circuit's decision in *Dellinger*, it was carefully handled by the trial judge, and in result, the record contains no foundation for petitioner's claim that the jury selected was not impartial.

(3) *THE INTRODUCTION OF INADMISSIBLE HEARSAY—TESTIMONY OF EVELYN ZIEBERT*

During the presentation of its case-in-chief, the prosecution called as a witness Mrs. Evelyn Ziebert, a friend of one of the victims, Mrs. Dean. Mrs. Ziebert testified to a conversation she had had with Mrs. Dean about two weeks before Mrs. Dean's death and outside of the petitioner's presence, during which Mrs. Dean related various problems she had with Douglas, including his lack of cooperation, refusal to work, demands for money, and complaints about the money she spent on herself. (Tr. at 386–398.) The Wisconsin Supreme Court found that the testimony was inadmissible hearsay under state law, but that the error

committed in admitting it was harmless. 67 Wis.2d at 531–533, 227 N.W.2d 712.

■ The petitioner contends that the admission of the testimony denied him his Sixth Amendment right to confrontation because his mother was not available at trial for cross-examination. The admission of evidence in violation of the hearsay rule does not, however, automatically result in the denial of a defendant's right to confrontation. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). If the hearsay statements were made by the declarant to the witness under circumstances containing sufficient "indicia of reliability" of the content of the statements, then no violation of the Sixth Amendment occurs when the witness's testimony is heard by the jury, since the witness is available for cross-examination on the question whether the statements were in fact made. *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27· L.Ed.2d 213 (1970).

■ In this case, there is no reason to believe that Mrs. Ziebert was lying or misrepresenting the statements made to her by Mrs. Dean. Her testimony that she was a close friend of Mrs. Dean's was not disputed, and the conversation occurred only four months before the trial. It is reasonable to assume that Mrs. Dean would have been candid to a friend in discussing her relationship with her son. Thus, there were sufficient indicators of reliability to conclude that Mrs. Zeibert was reporting the conversation accurately and that the declarations she reported were true. *United States v. Cogwell*, 486 F.2d 823, 834–835 (7th Cir. 1973), cert. denied 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310.

■ The materiality of Mrs. Dean's view of her relationship with the petitioner is another matter, see 67 Wis.2d at 531–533, 227 N.W.2d 712; however, claimed errors in the admission of evidence are not reviewable by a federal court on a habeas petition absent the infringement of a specific constitutional protection, *United States ex rel. Harris v. State of Illinois*, 457 F.2d 191, 198 (7th Cir. 1972), cert. denied 409 U.S. 860, 93

S.Ct. 147, 34 L.Ed.2d 106 (1972), and for the reasons set forth above, no Sixth Amendment violation occurred in this instance.

■ Finally, even assuming that the admission of Mrs. Ziebert's testimony was error under the Sixth Amendment, it was harmless. Mrs. Dean's and the petitioner's relationship was the subject of unobjectionable testimony by numerous other witnesses for both the prosecution and the defense (see, e. g., Tr. at 75–77, 283–285, 403–404, 407, 432–433, 445–448, 450–451, 674–675, 817–823, 825, and 854–857), and much of that testimony concerned the poor state of relations between them, including their financial disputes and the lack of assistance that the petitioner gave to his mother. Thus, the significance of Mrs. Ziebert's testimony as to Mrs. Dean's conversation was "'of peripheral significance at most,'" *United States v. Cogwell*, supra, at 834, quoting *Dutton v. Evans*, supra, 400 U.S. at 91, 91 S.Ct. at 221, and merely cumulative to the testimony of other witnesses.

**(4) INTRODUCTION OF EVIDENCE OF OTHER CRIMINAL CONDUCT BY PETITIONER**

The petitioner claims that evidence was introduced at trial of prior criminal conduct by him for which he was never prosecuted, and that the prejudicial effect of the introduction of such evidence deprived him of his right to a fair trial in violation of the Fourteenth Amendment. Specifically, petitioner challenges the inquiry made by the prosecution of various witnesses as to the suicide death of a girl friend of petitioner's (see, e. g., Tr. at 842–844, 866–867, 888–889, and 896–899), as to various conversations by petitioner with respect to killing other people (see, e. g., Tr. at 477, 909, and 919), and as to various drug transactions in which petitioner was allegedly involved (see, e. g., Tr. at 475, 480, 485–486, 488, 896–899, 917–918, 925–929, 939–945, and 948).

■ A writ of habeas corpus is not generally available to review trial errors with regard to the admissibility of evidence except in circumstances impugning fundamental fairness, *United States ex rel. Har-*

ris v. State of Illinois, 457 F.2d 191, 198 (7th Cir. 1972), cert. denied 409 U.S. 860, 93 S.Ct. 147, 34 L.Ed.2d 106 (1972), and a mere finding of prejudice is not enough. Rather, the effect of the prejudicial evidence must greatly outweigh its probative value to the jury. *United States ex rel. Bleimehl v. Cannon*, 525 F.2d 414, 421 (7th Cir. 1975); *United States ex rel. Durso v. Pate*, 426 F.2d 1083, 1086 (7th Cir. 1970), cert. denied 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445. The testimony on Dean's use of drugs was highly probative in view of the nature of his defense. The testimony on the death of his girl friend and the threats which he made against various persons, however, was not probative of his guilt for the crimes charged. A defendant may not be tried for his general character. *United States v. Dow*, 457 F.2d 246 (7th Cir. 1972).

The respondent argues that the petitioner, by failing to object to the testimony at trial, waived his right to challenge the evidence on appeal or in this proceeding, that the issue was raised before the Wisconsin Supreme Court only on state evidentiary grounds and not on the constitutional ground, and therefore that petitioner has not exhausted his state remedies.

The second point is without merit. Although the Wisconsin Supreme Court did not consider this claim on either state or federal grounds in its decision, the petitioner did raise the federal constitutional issue in his appellate brief. (See Exhibit C to the return filed July 20, 1977.) The first point has more merit. Under Wisconsin law the right to object on appeal is waived as to matters not objected to initially at the time of trial. *Gedicks v. State*, 62 Wis.2d 74, 214 N.W.2d 569 (1974). The waiver rule is inapplicable in cases involving errors of constitutional dimension, *Rudolph v. State*, 78 Wis.2d 435, 254 N.W.2d 471 (1978), cert. denied 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541, and the Supreme Court will decide such constitutional issues if there are no factual issues in need of resolution. *Rudolph v. State*, supra; *Cheatham v. State*, 85 Wis.2d 112, 270 N.W.2d 194 (1978). Where the alleged constitutional error is the denial of the right to a fair trial through the admission of prejudicial inadmissible evidence, however, the waiver rule is applicable except where the evidentiary error has a direct constitutional basis; for example, in the case of the admission of an involuntary self-incriminating statement or the admission of evidence derived from an illegal search and seizure. *State v. Williamson*, 84 Wis.2d 370, 380, 267 N.W.2d 337 (1978).

A nondeliberate waiver which precludes state appellate review because of a state contemporaneous objection rule also precludes federal habeas corpus review "absent a showing of cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violation." *Wainwright v. Sykes*, 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977). Where a federal court's failure to adjudicate the defendant's federal constitutional claim will result in a miscarriage of justice, however, the court may consider it, but where the "other evidence of guilt presented at trial" is "substantial to a degree that would negate any possibility of actual prejudice," the court need not consider it. *Wainwright v. Sykes*, supra, at 91, 97 S.Ct., at 2509.

Where the evidentiary error has a direct constitutional basis but the failure to object is a deliberate result of the defendant's trial strategy, no state appellate review is available. *Murray v. State*, 83 Wis.2d 621, 266 N.W.2d 288 (1978); *Jameson v. State*, 74 Wis.2d 176, 246 N.W.2d 541 (1976). A deliberate failure to object also precludes federal habeas corpus review. *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

In this case it appears that the deliberate waiver rule is applicable. None of the allegedly prejudicial evidence was elicited during the presentation of the prosecution's case. Indeed, it was the petitioner himself in responding to a question from his attorney who first brought up the matter of his girl friend's suicide and his alleged participation in the suicide by means of provid-

ing her with his gun and showing her how to use it. (Tr. at 672–677.) It was also the petitioner on direct examination who first testified about having told other persons that he was capable of killing and that he was accustomed to using hard drugs. (Tr. at 672–677 and 679–680.) Subsequent defense witnesses also were questioned by defense counsel about the suicide, the petitioner's threats of killing others, and the petitioner's involvement with drugs. (Tr. at 840, 845, 859–860, 862–863, and 887–888.) The prosecution inquired without objection into these areas during the cross-examination of Dean and of other defense witnesses (Tr. at 709–714, 760–762, 769–774, 842–844, 866–867, and 888–889) but only after the defense had opened the areas for inquiry. The conclusion that the defense deliberately elicited the testimony knowing that it would become an area of cross-examination and possibly of rebuttal testimony is inescapable.

The prosecution's case on motive consisted of testimony of the petitioner's poor relationship with his mother (Tr. at 403–404, 407, 445–448, 450–451, and 515–516) and of a statement which he made to a friend about getting money by killing his mother and his girl friend's mother for the inheritances. (Tr. at 465, 467–468, 478–479, 481, and 484.) The defense strategy was designed to show that Dean was not a regular user of hard drugs, that he inadvertently took drugs on the night the murders were committed, and that he could not remember the events of the night. In order to counter petitioner's past statements about his mother and the probable anticipated testimony about his prior familiarity with hard drugs, particularly LSD, the petitioner himself testified that while he was a nonviolent person and did not use drugs (Tr. at 667–672, 677–679, and 690), he enjoyed shocking his friends by making up stores about himself, his violent tendencies, and his use of drugs. He testified that his girl friend's suicide was one incident which he subsequently used for its shock value by pretending to have participated in it and induced her to shoot herself, and that his statements to friends about his mother

were made for the same purpose. The defense strategy was unsuccessful. Lack of success is not proof of lack of deliberateness, however. The testimony appears to have been elicited as a part of the defendant's trial strategy, and that being the case, it is not a ground for federal habeas corpus relief.

■ Even assuming that the prosecution exceeded the permissible bounds of cross-examination or rebuttal in some instances, that some of the evidence now objected to should not have been introduced, and that the deliberate waiver rule is not applicable, nevertheless the petitioner was not denied a fair trial on these grounds. The questioning by the prosecution on Dean's use of drugs was highly probative and necessary to counter his claim of inexperience. The questioning on Dean's threats against various persons and his participation in his girl friend's suicide was also probative to counter Dean's testimony on the import of his remarks about killing his mother and his girl friend's mother and to probe his theory that his talk of violence was just talk of a self-aggrandizing nature and was not translated into action. Consequently, the admission of the testimony did not rise to the level of an unconstitutional denial of fundamental fairness to the petitioner, and, thus, it is not the type of error for which this Court can order a remedy.

(5) *QUESTIONS BY THE PROSECUTION IMPLYING THE EXISTENCE OF EVIDENCE NEVER INTRODUCED*

■ The petitioner claims constitutional error with regard to two matters inquired into by the prosecution during the cross-examination of petitioner, both of which petitioner denied and about which the prosecution never introduced any evidence. First was the prosecution's questioning of petitioner about a specific illegal drug transaction at a Prange store (Tr. at 760 and 770), and second was a question about petitioner's ownership of a book on criminal investigation which set out the guidelines for parole for a first degree murder conviction. (Tr. at 759–760.) The Wisconsin Supreme

Court refused to review the claimed errors on the ground of waiver. *State v. Dean,* 67 Wis.2d 513, 534, 227 N.W.2d 712 (1975). See also *State v. Williamson,* 84 Wis.2d 370, 380, 267 N.W.2d 337 (1978). Thus, the errors are not subject to correction by this court absent a showing by petitioner of actual prejudice and of cause for the noncompliance with the State's procedural rule. *Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977).

■ No showing of cause for the noncompliance has been made. In addition, no actual prejudice exists. In *United States v. Meeker,* 558 F.2d 387 (7th Cir. 1977), the court, on appeal, reversed a conviction because of questioning by the prosecutor on matters which he had no reasonable basis to believe would subsequently be supported by admissible evidence. The Court held that it is prejudicial to invite conviction of a defendant on facts outside the record, that coming from the prosecutor the questions carry much weight when they are entitled to none, and that under the particular facts of the case—

" 'we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential.' " 558 F.2d at 390, quoting from *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

In this case, in contrast, the misconduct was slight. While the prosecution did not substantiate petitioner's involvement in the particular transaction at issue, the error was de minimus in view of the significant amount of testimony about petitioner's purchase, sale, and use of illegal drugs (see, e. g., Tr. at 906, 917–918, 925–929, 939–945, and 948), including his own admissions on cross-examination (Tr. at 770–774).

The error about petitioner's possession of the book on criminal investigation was more significant in that it tended to substantiate the prosecution's theory that petitioner

committed the murders for his own and his girl friend's inheritances and was aware of the possibility of parole after a murder conviction. That fact was not entirely " 'dehors the record,' " however, *United States v. Meeker,* supra, at 390, quoting from *United States v. Grossman,* 400 F.2d 951, 956 (4th Cir. 1968), cert. denied 393 U.S. 982, 89 S.Ct. 453, 21 L.Ed.2d 443, as were the facts complained of in *Meeker.* One of the prosecution's witnesses testified to a conversation she had with Dean in which he discussed the possibility of killing his mother and Mrs. Rammer and his expectation of serving ten years in prison if caught. (Tr. at 467–468, 478–479, 481, and 484.) A prosecution rebuttal witness, who was a cellmate of Dean's at the county jail, testified to a statement made by Dean to the effect that murder does pay if money is involved and if one is willing to spend some time in jail. (Tr. at 996–997.) Thus, the import of the prosecutor's questions, i. e., that petitioner was aware of the possibility for parole, was substantiated in the record by admissible evidence. Furthermore, the questioning represents a single incident of misconduct by the prosecutor, rather than pronounced and persistent misconduct. The record therefore fails to substantiate petitioner's claim of actual prejudice arising out of the erroneous questioning.

(6) *INEFFECTIVE ASSISTANCE OF COUNSEL*

The petitioner contends that he was denied his right guaranteed by the Fourteenth Amendment to the effective assistance of counsel. He cites in support of his claim his counsel's failure to request a change of venue and his failure to interpose objections to clearly inadmissible testimony, which failure, petitioner contends, resulted in a denial to him of fundamental constitutional rights. See *State v. Dean,* supra, 67 Wis.2d at 535 and 537, 227 N.W.2d 712.

■ " * * * [T]he Constitution guarantees a criminal defendant legal assistance which meets a minimum standard of professional representation." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641

(7th Cir. 1975), cert. denied sub nom. *Sielaff v. Williams*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975).[4] The burden of demonstrating inadequacy is on the defendant, *Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975); *United States ex rel. Ortiz v. Sielaff*, 542 F.2d 377 (7th Cir. 1976); *United States v. Fleming*, 594 F.2d 598, 607 (7th Cir. 1979), cert. denied 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299, and Dean has not met his burden.

As previously stated in this decision, the voir dire conducted was adequate to protect petitioner's right to a fair and impartial jury. A request for a change of venue is not the only means available to protect a defendant from the adverse effects of pretrial publicity. *Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971). Also as previously stated, while the prosecution did without objection ask several questions of petitioner during cross-examination without subsequent foundation, the effect of those questions was de minimus and not of sufficient severity to result in a denial of petitioner's right to a fair trial. As for the questioning about petitioner's hiring of an attorney and his refusal to provide a medical history without the presence of his attorney, which the Court has found was violative of petitioner's rights under the Fifth and Sixth Amendments, petitioner's counsel did object to those lines of questioning (Tr. at 744) and was overruled. Thus, it was not the error of Dean's counsel which resulted in the admission of that clearly erroneous testimony.

■ The most serious error which Dean's counsel committed was his questioning of Dean which opened up the areas of the suicide of Dean's former girl friend and his threats against various persons other than the victims. On retrospective review of the transcript, those areas of testimony appear to have been highly prejudicial to Dean and to have multiplied the negative impression which the jury received of him rather than to have mitigated the impact of the statements which Dean made about killing his mother and Mrs. Rammer. Nevertheless, the effective assistance of counsel does not require success at trial or the total absence of strategic or tactical errors. *United States v. Fleming*, supra, at 607; *United States ex rel. Rooney v. Housewright*, 568 F.2d 516, 520 (7th Cir. 1977). Dean might have fared better had the areas been left unexplored, but it is always easier after the fact to find fault with a defense attorney's trial tactics than to select the best defense in the face of a damning case for the prosecution.

It is the Court's opinion that serious errors were made with regard to the presentation and admission of evidence in this case. Two of those errors, which are discussed in section (1) above, require that Dean's petition for a writ of habeas corpus be granted. The legal assistance which Dean's counsel provided to him during the trial, however, satisfied at least "a minimum standard of professional representation," *United States ex rel. Williams v. Twomey*, supra, at 641. A review of the entire transcript reveals that petitioner's attorney did make frequent objections, engaged in effective cross-examination, and presented a thorough, if unsuccessful, defense. Therefore, the ground of ineffective assistance of counsel does not provide an alternative basis for issuance of the writ.

## (7) THE IMPOSITION OF CONSECUTIVE LIFE SENTENCES

■ The petitioner contends that the imposition of five consecutive life sentences, which precludes him from parole eligibility for a period in excess of fifty years, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. The claim is without merit.

4. Respondents contend that the applicable standard is whether the trial leading to conviction was "a farce, or a mockery of justice," *Johnson v. United States*, 422 F.2d 555, 557 (7th Cir. 1970); *United States v. Dilella*, 354 F.2d 584, 587 (7th Cir. 1965), because Dean was tried in 1971, and the *United States ex rel. Williams v. Twomey* decision, which broadened the applicable standard on effective assistance of counsel, was issued in 1975. The underlying conviction in *United States ex rel. Williams v. Twomey* was, however, obtained in 1968.

In *Schick v. Reed*, 419 U.S. 256, 266–267, 95 S.Ct. 379, 385, 42 L.Ed.2d 430 (1974), rehearing denied 420 U.S. 939, 95 S.Ct. 1150, 43 L.Ed.2d 416, in upholding the power of the President under Article II, § 2, clause 1, of the Constitution to commute a death sentence to life imprisonment without parole, the Supreme Court stated:

> " * * * The plain purpose of the broad power conferred by § 2, cl. 1, was to allow plenary authority in the President to 'forgive' the convicted person in part or entirely, to reduce a penalty in terms of a specified number of years, or to alter it with conditions which are in themselves constitutionally unobjectionable. * * *

> " * * * The no-parole condition attached to the commutation of his death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; it does not offend the Constitution. * * * "

See also *Moore v. Cowan*, 560 F.2d 1298 (6th Cir. 1977), cert. denied 435 U.S. 929, 98 S.Ct. 1500, 55 L.Ed.2d 525, 436 U.S. 960, 98 S.Ct. 3079, 57 L.Ed.2d 1127 (1978); *Carmona v. Ward*, 576 F.2d 405, 414 (2d Cir. 1978), cert. denied 439 U.S. 1091, 99 S.Ct. 874, 59 L.Ed.2d 58 (1979); *Government of Virgin Islands v. Gereau*, 592 F.2d 192 (3d Cir. 1979); *Rummel v. Estelle*, 445 U.S. 263, 272–276, 100 S.Ct. 1133, 1138–1140, 63 L.Ed.2d 382 (1980).

## ORDER

In conclusion, the Court on review of the entire trial transcript is persuaded that the petitioner committed the five killings for which he was charged with five counts of first degree murder, and that the jury could have found him guilty as charged on all five counts even without the evidence elicited by the prosecution, in violation of the petitioner's exercise of his Fifth Amendment right to silence and his Sixth Amendment right to counsel as described in section (1) above. The Court is also persuaded, however, that there is a reasonable possibility that that erroneous evidence contributed to the jury's findings of guilt and, therefore, however reluctantly, it is satisfied that the errors committed during the petitioner's trial were not harmless and that the writ must issue.

IT IS THEREFORE ORDERED that the relief requested by the petitioner Douglas G. Dean in his application for a writ of habeas corpus is granted, and that judgment be entered vacating the judgment of conviction in Case No. 7758, State of Wisconsin vs. George Douglas Dean, Sheboygan County Court Branch # 2, and ordering the release of the petitioner from custody.

IT IS FURTHER ORDERED that execution of the judgment is stayed for a period of 120 days from the date of entry of judgment, to allow the State of Wisconsin an opportunity to commence the retrial of the petitioner, and that if an appeal is taken by the respondents from the judgment in this action, then execution of the judgment is stayed indefinitely pending the disposition of the appeal.