MURRAY, Plaintiff in error, v. STATE, Defendant in error.

*No. 76–181–CR. Submitted on briefs April 6, 1978.—*
*Decided June 6, 1978.*
(Also reported in 266 N. W. 2d 288.)

For the plaintiff in error the cause was submitted on the briefs of *Howard B. Eisenberg,* state public defender, and *Ruth S. Downs,* deputy state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Maryann S. Calef,* assistant attorney general.

BEILFUSS, C. J. At approximately 1:35 a.m., on September 4, 1973, three men armed with a shotgun and knives robbed Maury's Tap in Racine. The tavern, which was just closing, was occupied by owner Maury Roushia, his daughter Anita Leissner, her husband Robert Leissner, and a customer Antonio Serna. The robbers took wallets, a couple bottles of liquor, and $1,400 in cash and checks from the safe. Maury Roushia received a slight knife wound.

Minutes later, a Racine police officer followed an automobile which he saw run a stop sign about one block from Maury's Tap and proceeded to a house about six blocks away. Several persons ran from the car into the house. At this point a police dispatch reporting the robbery at Maury's Tap went out. Additional police units surrounded the house. Two men, Alfred Burns and Jeff Knuckles, were stopped as they ran from the building. The police received permission to search from both the downstairs tenant, Rosa Lee Aikens, and the upstairs tenant, Pearly Mae Aikens (Rosa's mother). Several persons were discovered upstairs: Jesse Jones, George Malone, Fred and George Phillips, Robert Murray, James Aikens, his wife, and one or two small children. The police found some cash and checks, liquor bottles and a shotgun.

Three persons were arrested: Malone, Fred Phillips and the defendant Murray. The only one of the robbery victims able to identify Murray as one of the robbers was Antonio Serna.

Murray, who had been raised by Pearly Mae Aikens, had been staying at the house for some time. His defense was that he had gone out at about 10 p.m., but had returned and was in bed by midnight. Neither Pearly nor Rosa Lee Aikens could corroborate his story, having themselves retired between 9 and 9:30. James Aikens testified that he also had gone to bed early but stated

that he thought that Murray came into the flat around 11:15 or 11:30.

Alfred "Junebug" Burns and Jeff Knuckles were sitting in the kitchen of the Aikens' place on the night of the robbery. Some time after 1 a.m., several men burst through the door and ran into another room. Burns testified that only two men entered the house. He stated that he was certain that one of the men was Phillips but was unable to make a positive identification of the other man. He did state, however, that he thought the other man was Murray.

Jeff Knuckles testified that three men had entered the Aikens' home. He stated that two of them were Malone and Phillips. When asked to identify the third man, Knuckles hesitated and the district attorney asked that he be allowed to treat Knuckles as a hostile witness. The trial court ordered Knuckles to answer and the witness stated that the third man was named "Chubby." Knuckles testified that he did not know Chubby's regular name, but pointed out the plaintiff in error Robert Murray (Chubby) as the third man to enter the Aikens' kitchen after 1 a.m., on the morning of the robbery.

After the identification of Murray, the prosecution again requested that Knuckles be declared a hostile witness and defense counsel responded that Knuckles was being intimidated. An in-chambers discussion ensued where the trial court several times advised Knuckles that he could be charged with contempt if he refused to truthfully answer all questions. It became apparent that Knuckles had told defense counsel that only two men had entered the Aikens' house. The following exchange took place:

"MR. SKIBA: What did you tell Mr. Flynn last night?
"THE COURT: Speak up now. Remember you're still under oath.

"THE WITNESS: Two men came in the house.

"THE COURT: Well, what's the truth? You identified this man, the defendant, today. Now, which is true?

"THE WITNESS: There were three.

"THE COURT: That's correct, isn't it?

"THE WITNESS: All right, yes.

"THE COURT: Well, I am satisfied with that now."

The trial court then offered its own explanation for Knuckles' differing stories and hesitation:

"I think he is scared all right, but I think he is scared of two things. I think he is a friend of this defendant, and he hates like blazes to have to put the finger on him. No question about that. . . . I suppose Mr. Murray is one of your old friends, and you hate like blazes to tell the story what happened, but you have got to do it."

The proceedings in open court then resumed and Knuckles stated that three men came into the house and one of them was the defendant Murray. On cross-examination Knuckles informed the jury that he had told defense counsel, the night before, that only two men had entered the house. The jury was also apprised of the facts that Knuckles was originally arrested as a participant in the robbery, that he ignored a subpoena to appear at a preliminary hearing, that a bench warrant was issued for his arrest and that he was placed under bond.

At the close of testimony the jury began its deliberations. After several hours the jury requested that the testimony of Burns and Knuckles be read back. When the court reporter, evidently covering her first trial, read back the testimony she mistakenly included the in-chambers discussion in the reading. The trial court later stated that he did not realize the mistake until the reading was almost over, at which point he felt it would be counterproductive to raise the matter. Defense counsel did not object and stated that his failure to do so was a matter of strategy. Within one hour of the reading

the jury returned a verdict of guilty. Murray was sentenced to four indeterminate, concurrent terms of not more than nineteen years.

The issue before this court is whether the reading of the in-chambers discussion prejudiced the defendant and requires a new trial. We conclude that although it was error a new trial need not be ordered.

The state concedes the error, but argues that it was harmless. While much of what transpired in chambers could have occurred with no adverse repercussions in open court, it is clear that a trial court cannot pass judgment on either the motives or the veracity of a witness in open court. These are matters for the jury, the trier of fact.[1] In a case like this, where Knuckles' testimony was crucial as the only evidence to bolster Antonio Serna's identification of Murray as the third robber, the comments of a judge indicating that a witness is worthy of belief and stamping approval on one version of the facts is not harmless error.

"The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt. . . . This test is based on reasonable probabilities." *Wold v. State,* 57 Wis.2d 344, 356–57, 204 N.W.2d 482 (1973).

All of Jeff Knuckles' testimony, even his identification of Murray prior to the in-chambers discussion, must be considered tainted as influenced by the improper exposure of the jury to the trial court's comments. Without this testimony the state's case rests almost completely on the identification of Murray by Antonio Serna. This

---

[1] *Turner v. State,* 76 Wis.2d 1, 10, 250 N.W.2d 706 (1977); *State v. White,* 68 Wis.2d 628, 636, 229 N.W.2d 676 (1975).

the case comes down to a one-to-one confrontation between Serna's identification and Murray's claim that he was home that night.

Certainly juries have convicted defendants in situations where only one witness supports the verdict. But in such a situation the jury has the decided advantage of observing the opposing witnesses and being able to judge their relative credibility. An appellate court faced with such a one-on-one confrontation cannot determine credibility or observe demeanor. In this case, without the testimony of Jeff Knuckles, we cannot conclude there is sufficient evidence to support the verdict beyond a reasonable doubt when analyzed from an appellate court's point of view.

Furthermore, it cannot be gainsaid that Knuckles' testimony probably had an important, if not paramount, impact on the jury's decision to disbelieve Murray's story. The fact that the jury specifically requested that Knuckles' testimony be re-read after several hours of deliberation indicates the crucial nature of the testimony. Without that testimony it is simply impossible to determine what the jury would have done. To hold that the error was harmless and affirm the conviction on that basis would be sheer guesswork.

However, we conclude that the trial court should be affirmed on the basis of defense counsel's strategic waiver of any objection to the improper reading of the in-chambers statements. This court has consistently held that a deliberate failure to object is binding on a defendant and forecloses a demand for a new trial.

"Counsel cannot follow one strategy during trial, and then, for whatever reason, later complain if trial tactics turn out to be unsuccessful." *Jameson v. State,* 74 Wis.2d 176, 185, 246 N.W.2d 541 (1976). *See also, Mentek v. State,* 71 Wis.2d 799, 808, 238 N.W.2d 752 (1976);

*State v. McDonald,* 50 Wis.2d 534, 538, 184 N.W.2d 886 (1971).

Murray seeks to distinguish these cases by responding that you cannot waive objection to an act by failure to object beforehand if you don't know what is going to occur. He also contends that the waiver can be excused because the jury had already heard part of the in-chambers discussion by the time defense counsel realized that it was being read back, and that to object at that point would have done more harm than good.

These arguments miss the point. When defense counsel realized that the in-chambers discussion was being improperly read to the jury, he was faced with the decision of whether to object or not. Had he objected immediately it is mere conjecture to assume that such an objection would have caused more harm than failure to object would have. Furthermore, defense counsel could have asked for a curative instruction, that the jury ignore all statements from the in-chambers discussion, or he could have made an immediate motion for mistrial. Additionally, it is clear from a reading of the remarks that it is only the second half of the discussion which might have been prejudicial to the defendant. Not until the court indicated its approval of Jeff Knuckles' answer that three, not two men, entered the house, was anything said which prejudiced the defendant. Had defense counsel objected during the first part of the reading the jury would not have been exposed to any possible prejudicial material.

This court will not allow defense counsel to raise a matter after deliberately choosing to forego objection. As noted in *State v. McDonald,* 50 Wis.2d 534, 540, 184 N.W.2d 886 (1971):

"Chaos in the administration of justice and lack of legal economy and orderly procedure in criminal suits will result if defense counsel can sit back during trial and not object to evidence they claim is illegal and later seek an acquittal or a new trial on the ground a violation of a constitutional right was involved."

We reiterate that a deliberate decision not to object, as a matter of strategy, to an obvious error at trial, constitutes a binding waiver. The defendant is foreclosed from arguing that the reading of the in-chambers discussion prejudiced his case.

*By the Court.*—Judgment affirmed.