COURT OF APPEALS
DECISION
DATED AND FILED

May 2, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP636-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF242

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

ZACHARY T. HOGENSON,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Grant County: CRAIG R. DAY, Judge. *Affirmed*.

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Zachary Hogenson appeals a judgment of conviction, following a jury trial, on one count of repeated sexual assault of the

same child in violation of WIS. STAT. § 948.025(1)(e) (2021-22).[1] Hogenson also appeals the denial of his postconviction motion for a new trial. He raises three issues.

¶2 Hogenson argues that the circuit court erred in denying his postconviction motion because his trial counsel provided constitutionally ineffective assistance. Hogenson contends that trial counsel failed to adequately cross-examine the victim ("A.B.") and failed to call several witnesses who could potentially provide additional evidence that could be used to undermine A.B.'s trial testimony.[2] We conclude that Hogenson fails to establish either that his counsel performed deficiently or that any supposed deficiency was prejudicial.

¶3 Hogenson also argues that his trial counsel violated Hogenson's Sixth Amendment right to determine the objective of Hogenson's defense by essentially conceding his guilt during closing argument, contrary to Hogenson's desire to claim innocence. We conclude that Hogenson fails to establish that his counsel conceded his guilt.

¶4 Hogenson separately argues that the circuit court invaded the province of the jury through an instruction that the court gave in response to a question the jury sent out during deliberations. We conclude that the court properly exercised its discretion under the particular circumstances here, and we reject Hogenson's argument that the instruction inaccurately stated the law.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Consistent with WIS. STAT. § 809.19(1)(g), we refer to the victim as "A.B." using initials that do not correspond with her name.

¶5     Accordingly, we affirm.

## BACKGROUND

¶6     The criminal complaint charged Hogenson with one count of repeated sexual assault of A.B. when she was under age 16, "from approximately May 2007 through 2008." *See* WIS. STAT. § 948.025(1)(e).[3]  During this period, A.B. was 13 and 14 years old and Hogenson was 19 and 20 years old.  The complaint alleged that at least three of the assaults were violations of WIS. STAT. § 948.02(1) or (2), based on allegations of penis-to-vagina, penis-to-mouth, and anal sexual intercourse.  *See* § 948.02(2) (prohibiting in pertinent part "sexual intercourse with a person who has not attained the age of 16 years"); WIS. STAT. § 948.01(6) (defining "sexual intercourse").

¶7     A.B. testified at trial in part as follows.  She met Hogenson in the spring of 2007 when he, as a senior in high school, was an assistant teacher in one of her seventh grade classes.  A.B. and Hogenson exchanged messages through email, social media, and texting, and eventually they also kissed.  Later, during the summer of 2007, Hogenson picked A.B. up from her grandmother's house and drove her to a campground, where he had penis-to-vagina intercourse with her in his car.  After the first instance of intercourse, there were several instances of Hogenson having mouth-to-penis intercourse with A.B., when he would force her head onto his penis.  There was also at least one instance of mouth-to-vagina intercourse, in addition to repeated instances of anal intercourse.  This conduct

---

[3] As charged by the State here, "Whoever commits 3 or more violations under [WIS. STAT. §] 948.02(1) or (2) within a specified period of time involving the same child is guilty of … [a] Class C felony." *See* WIS. STAT. § 948.025(1)(e).

3

occurred one to three times a month beginning in the summer of 2007, lasting through the fall of 2008.

¶8 Jumping ahead to May 2019, there was evidence of the following event, which is pertinent to multiple issues raised on appeal. Hogenson, who was then a police officer in Fennimore, stopped a car for speeding. A.B. was a passenger in the car. The car was being driven by A.B.'s then-boyfriend ("the boyfriend"). A.B. testified at trial that the boyfriend was verbally "aggressive[]" with Hogenson during this traffic stop "because [A.B.] had told [the boyfriend] what had happened to" A.B. when she was younger. A.B. first reported the allegations of sexual assault to police later that month.

¶9 Hogenson took the position at trial that the prosecution should not be permitted to introduce trial testimony regarding prior consistent statements made by A.B. to others regarding the alleged sexual assaults before she made her initial report to police in 2019. These statements were hearsay because Hogenson was not alleging that the allegations were the product of recent fabrication or improper influence or motive. *See* WIS. STAT. § 908.01(4)(a)2. (statement by a witness regarding another witness's prior, out-of-court statement is not hearsay when the statement is consistent with the other witness's testimony and "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive"). More specifically, counsel represented that the defense would not argue at trial that A.B. fabricated the allegations she made to police and again in her trial testimony as a result of the conflict between the boyfriend and Hogenson during or related to the 2019 traffic stop. The circuit court accepted the commitment of the defense that it would not raise this fabrication theory and on this basis barred the prosecution from adducing testimony regarding A.B.'s prior consistent statements or referencing them.

4

¶10    The defense did not call Hogenson or any other witness.

¶11    During closing argument, defense counsel told the jury that the lack of corroboration of A.B.'s testimony regarding events that occurred more than 12 years before trial resulted in the prosecution failing to meet its burden to prove guilt beyond a reasonable doubt. Counsel emphasized what counsel contended were gaps in A.B.'s testimony regarding facts important to the plausibility of A.B.'s allegations. Counsel specifically told the jury that he was not arguing that A.B.'s reporting of the assaults to police in May 2019 was connected to the traffic stop.

¶12    The deliberating jury sent out a question to the circuit court regarding the timing of A.B.'s "initial report" of the alleged sexual assaults relative to the traffic stop. Over Hogenson's objection, the court answered the question by instructing the jury in part that neither party was asserting that A.B. "fabricated the allegations of sexual assault" based on the traffic stop or the boyfriend's influence over A.B. The court told the jury that it should "[d]isregard any suggestion" to the contrary.

¶13    The jury found Hogenson guilty on the single count charged.

¶14    Hogenson filed a postconviction motion alleging that he had received ineffective assistance of trial counsel based on the failure to undermine A.B.'s trial testimony in various ways, including by failing to call as witnesses the very witnesses that defense counsel had sought to exclude with the defense motion to keep out A.B.'s prior consistent statements. Hogenson also raised the Sixth Amendment argument that trial counsel had conceded that he was not innocent contrary to *McCoy v. Louisiana*, 584 U.S. 414 (2018).

¶15    The circuit court held an initial *Machner* hearing at which Hogenson's trial counsel testified. *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). The court rejected some grounds for Hogenson's ineffective assistance claim and the entirety of his concession-of-innocence claim. However, the court held a follow-up hearing, at which Hogenson presented testimony from some of the individuals who Hogenson argued trial counsel was deficient for failing to call as trial witnesses. The court then denied Hogenson's motion, rejecting the remaining grounds for his ineffective assistance claim.

¶16    Hogenson appeals.

## DISCUSSION

### I. Ineffective Assistance of Trial Counsel

¶17    Hogenson argues that his trial counsel rendered ineffective assistance by failing to adequately cross-examine A.B. on "numerous material inconsistencies" and for failing to call several witnesses who could have undermined A.B.'s testimony. Closely related, Hogenson argues that trial counsel was ineffective for conceding that the May 2019 traffic stop and the boyfriend's conduct surrounding the stop did not influence A.B. in making the allegations against Hogenson. Consistent with the circuit court's approach, we address this argument by dividing it into two categories. The first category relates to potential means that trial counsel could have used, but did not use, to contradict details of A.B.'s testimony in general. The second specifically challenges her account of the chronology of the assaults, which Hogenson argues involved a missed chance for counsel to argue for misdemeanor offenses instead of a single felony offense, based on the argument that she had turned 16 by the time of the assaults.

¶18 We now provide pertinent legal standards. Then we summarize additional background and explain our conclusions regarding each ineffective assistance category.

¶19 Under the Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 7 of the Wisconsin Constitution, a criminal defendant is guaranteed the right to effective assistance of counsel. *See State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93; *see also Strickland v. Washington*, 466 U.S. 668 (1984). "Whether a defendant was denied effective assistance of counsel is a mixed question of law and fact": "The factual circumstances of the case and trial counsel's conduct and strategy are findings of fact, which will not be overturned unless clearly erroneous"; whether the facts satisfy the legal requirements of an ineffective assistance of counsel claim is an issue of law, reviewed de novo. *See Breitzman*, 378 Wis. 2d 431, ¶37. "To demonstrate that counsel's assistance was ineffective, the defendant must establish that counsel's performance was deficient and that the deficient performance was prejudicial." *Id.* (citing *Strickland*, 466 U.S. at 687). "If the defendant fails to satisfy either prong, we need not consider the other." *Id.* (citing *Strickland*, 466 U.S. at 697).

¶20 Regarding the deficient performance prong, which we conclude resolves the first part of Hogenson's ineffective assistance argument, our supreme court has explained:

> To establish that counsel's performance was deficient, the defendant must show that it fell below "an objective standard of reasonableness." In general, there is a strong presumption that trial counsel's conduct "falls within the wide range of reasonable professional assistance." Additionally, "[c]ounsel's decisions in choosing a trial strategy are to be given great deference."

*Breitzman*, 378 Wis. 2d 431, ¶38 (citations omitted; alteration in *Breitzman*). Demonstrating that another trial strategy "may look better in hindsight" does not cause trial counsel's strategic choices to become unreasonable. *See State v. Mull*, 2023 WI 26, ¶49, 406 Wis. 2d 491, 987 N.W.2d 707; *see also State v. Harper*, 57 Wis. 2d 543, 556-57, 205 N.W.2d 1 (1973) ("In considering alleged incompetency of counsel, one should not by hindsight reconstruct the ideal defense."). Similarly, this court "will not second-guess a trial attorney's 'considered selection of trial tactics or the exercise of professional judgment in the face of alternatives that have been weighed by trial counsel.'" *State v. Elm*, 201 Wis. 2d 452, 549 N.W.2d 471 (Ct. App. 1996) (quoting *State v. Felton*, 110 Wis. 2d 485, 502, 329 N.W.2d 161 (1983)).

¶21 The following standards apply regarding the prejudice prong, which we conclude is dispositive on the chronology issue:

> To establish that deficient performance was prejudicial, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Breitzman*, 378 Wis. 2d 431, ¶39 (quoted source omitted).

### A. Impeachment with Prior Inconsistent Statements and Presentation of Testimony from Other Witnesses

¶22 Hogenson emphasizes inconsistencies between A.B.'s trial testimony and prior statements that she had made to others as reflected in police reports and the postconviction testimony. Regarding this category, we agree with the State that Hogenson fails to establish that his trial counsel performed deficiently, because counsel's decision not to pursue such impeachment was grounded in reasonable strategic considerations. Relatedly, we conclude that

Hogenson fails to establish that counsel's decision not to rely more explicitly on facts involving Hogenson's traffic stop of the boyfriend and A.B. was objectively unreasonable.

*Additional Background*

¶23 At trial, defense counsel sought to undermine the credibility of A.B.'s allegations in a number of respects. For example, after A.B. testified that she was afraid of Hogenson, counsel cross-examined her about instances when A.B., as an adult, allegedly sought Hogenson's company. As another example, counsel questioned how Hogenson was never caught when he allegedly repeatedly snuck into A.B.'s grandparents' house to commit assaults, given that the house had an open layout, except for one bathroom where many of the assaults allegedly occurred.

¶24 Much of Hogenson's postconviction motion addressed inconsistencies between A.B.'s trial testimony and statements given during the two interviews that police conducted with A.B. Hogenson's motion also highlighted purported inconsistencies between A.B.'s statements and statements that other people made to police.

¶25 At the initial ***Machner*** hearing, trial counsel testified that he would have reviewed police reports reflecting the June 2019 interviews of A.B. and other potential witnesses. But he further testified that he could not recall details from the reports of A.B.'s interviews or how they might have varied from the details in the reports of interviews with others or A.B.'s trial testimony.

¶26 Counsel opined that his cross-examination of A.B. was successful in causing her to become "surly," "defensive," and "uncooperative" in a way that

could cause a jury to doubt the reliability of her testimony, and that in his estimation, going further in attempting to impeach her could have jeopardized that success.

¶27 Counsel gave his general views on defense tactics such as attacking an alleged victim's credibility and highlighting prior inconsistent statements that included the following. When the topic of impeachment does not relate to an element of the offense, "nitpicking" prior inconsistent statements by a witness risks the appearance of "pick[ing] on" the witness, and can readily result in the defense losing the jury's interest. In counsel's view, this type of "nitpicking" is easily rebutted by a prosecutor's predictable argument that victims will naturally fail to recall or inaccurately recall some details, while the core of the inculpatory testimony remains credible.

¶28 Although defense counsel told the jury that the defense was not relying on the 2019 traffic stop to support a claim of fabrication or improper influence or motive, counsel testified that he nonetheless tried to hint at that theory. Counsel testified that he made a strategic choice to attempt to elicit some testimony regarding the traffic stop with the goal of encouraging the jury to "distrust [A.B.'s] accusations" based on the conclusion that she made them because the boyfriend pushed for a police investigation of Hogenson, even though A.B. initially did not want to pursue an investigation. However, counsel testified, in doing so counsel was careful not to explicitly argue that A.B. "fabricated" her allegations "to placate" the boyfriend, because this risked "opening the door"— prompting a decision by the circuit court to allow the prior consistent statements that the prosecution wanted to offer. Counsel testified that he believed that admission of the prior consistent statements would have "really strengthen[ed]" the prosecution case and bolstered A.B.'s credibility. In his view, the prior

consistent statements were "Kryptonite" to the defense case—a reference to the fictional material that severely weakens Superman upon exposure.

¶29 As noted, the circuit court rejected the majority of Hogenson's postconviction claims following the initial *Machner* hearing.

*Analysis*

¶30 Regarding many of the alleged inconsistencies between A.B.'s trial testimony and her statements to police, Hogenson fails to account for a dilemma that trial counsel faced. The dilemma was that A.B.'s statements to police and her trial testimony were consistent in conveying the core, inculpatory points, even as they varied in certain related details. As a result, many of the inconsistencies that Hogenson now cites were bound up in A.B.'s highly inculpatory, consistently asserted statements that she and Hogenson engaged in sexual intercourse when she was younger than 16. For example, Hogenson now argues that trial counsel should have impeached A.B. regarding details of when, according to A.B., Hogenson moved from mere kissing to having sexual intercourse with her. Hogenson fails to show that it was objectively unreasonable for trial counsel to determine that it would have hurt the defense more than it would have helped to highlight inconsistent details when this would have caused the jury to be reminded of her consistent statements about sexual intercourse while she was under 16.

¶31 This same reasoning undermines much of Hogenson's argument about the potential testimony of others who were interviewed by police but not called as witnesses at trial. As an example of two potential witnesses, Hogenson notes that the boyfriend and another, former boyfriend of A.B. told police that A.B. had told each of them that Hogenson used some degree of force or that she did not consent to at least some of the alleged sexual assaults. Hogenson now

11

purports to contrast these statements with statements that A.B. allegedly made to a friend and another acquaintance that made no mention of there being a degree of force or lack of actual consent during the assaults. It was reasonable for trial counsel to conclude that, whatever possible rewards could have arisen for the defense from highlighting these purported inconsistencies, they were not worth the great risk of inadvertently highlighting the fact that A.B. was consistent over time in alleging that Hogenson had sex with her during the time period charged.

¶32 More generally, Hogenson's argument on this issue fails to adequately account for trial counsel's detailed testimony at the initial *Machner* hearing regarding his strategic assessment of additional potential impeachment and, more broadly, his chosen trial strategies.

¶33 Explaining his argument further, Hogenson contends that it would have been a stronger defense strategy to rely more explicitly on the traffic stop in part by calling the boyfriend, in combination with highlighting inconsistencies in A.B.'s statements to others, which Hogenson now argues show a pattern of falsely accusing him only to her boyfriends but not to others. The argument is complicated, but it appears to go like this. Assuming that the boyfriend testified consistently with his statement to police, this would have provided a basis for trial counsel to argue to the jury that the boyfriend's conflict with Hogenson during the traffic stop created pressure on A.B. to maintain false allegations against Hogenson with law enforcement, which would have been consistent with the allegedly false narrative that she had given to the boyfriend before the stop.

¶34 The first problem with this complicated argument is that it is speculative. It does not establish the likelihood of highly probative and exculpatory new evidence at a second trial, especially given that trial counsel did

seek to rely on the traffic stop, albeit not explicitly so. Second, Hogenson does not dispute that this would have opened the door to the introduction of prior consistent statements by A.B. that trial counsel viewed as having potentially disastrous results for the defense. *See* WIS. STAT. § 908.01(4)(a). Given the dubious potential probative value of, and the likely strategic value in avoiding, the prior consistent statements, Hogenson fails to establish deficient performance.

### B.     A.B.'s Chronology of Assaults

¶35     Turning to Hogenson's chronology-related category of ineffective assistance claims, the argument is based on witness accounts that he contends would have undermined key aspects of A.B.'s chronology of relevant events. He apparently intends to argue that counsel was ineffective for failing to call these witnesses in order to provide the basis for the alternative jury argument that the alleged assaults might not have taken place until A.B. was 16 years old. This in turn could have resulted in a conviction for a less severe offense. *Compare* WIS. STAT. § 948.025(1) (imposing felonies for repeated violations of WIS. STAT. § 948.02(1)-(2), which addresses sexual assault of children not yet 12, 13, or 16 years old depending on other conduct involved) *with* WIS. STAT. § 948.09 (sexual intercourse with a child over the age of 16 is guilty of a Class A misdemeanor if the defendant is 19 or older). On this issue we conclude that Hogenson fails to show that he was prejudiced.

*Additional Background*

¶36     To repeat, A.B. told police that the alleged sexual assaults began in 2007 when she was 13, in the summer between her 7th and 8th grade years, and ended in 2008 when she was 14, in the fall of her first year of high school. During one of the police interviews, a detective asked A.B. what Hogenson "was …

doing" "at that time," in an apparent reference to the general time period of the assaults. A.B. responded that "he was milking at a farm … outside of town and living with his parents" in Fennimore, with the farm being outside Fennimore. During the same interview, A.B. was asked whether Hogenson had contact with other young females "during that time." A.B. responded that "when he was farming, there was a … girl on the farm" who was "a few years younger" than A.B. A.B. identified this person by name.

¶37 Police interviewed the person identified by A.B., whom we will refer to as C.D. C.D. told police that she and Hogenson worked together on C.D.'s father's farm. C.D. could not recall "exactly" when Hogenson started working at the farm, but she said that she was in high school at the time.

¶38 Hogenson's position is that, based on these statements and A.B.'s statements to police about Hogenson's work during the period of the alleged assaults, the defense could have plausibly argued that A.B. would have been 16 or older at the time of the assaults. The logic would be that the assaults took place while Hogenson lived in Fennimore and worked with C.D. on the nearby farm, when C.D. was high-school-aged, *i.e.*, at least 14. This would have meant that, if C.D. was "a few years younger" than A.B., then A.B. would have been at least 16.

¶39 At trial, A.B. testified consistently with her statements to police regarding how and when she met Hogenson—in her 7th grade science class in the spring of 2007. She was also consistent, between her statements to police and her testimony at trial, in asserting that the first time Hogenson had sexual intercourse with her was during the summer of 2007, between her 7th and 8th grade years; and that, following this first incident, he had oral and anal sex with her up until "the

14

beginning of" her first year in high school or "the fall of 2008." Neither side called C.D. as a trial witness.

¶40 At the initial *Machner* hearing, Hogenson's trial counsel testified in pertinent part as follows. Hogenson told him before trial that Hogenson did not live in Fennimore or work on the nearby farm "until several years after" the period of alleged assaults. Counsel was aware of C.D.'s statement to police about when she and Hogenson both worked on the farm, although postconviction counsel's questioning of trial counsel did not delve into the possible inference that A.B. was 16 or older during the period of alleged assaults. Trial counsel testified that he considered this merely "another prior inconsistency that [counsel] really didn't want to bring up" at trial.

¶41 At the supplemental *Machner* hearing, C.D., C.D.'s father, and Hogenson testified. C.D. and C.D.'s father both testified that Hogenson started working on C.D.'s father's farm near Fennimore in "late fall of 2008" (when A.B. was 14 years old). When he started there, C.D. was 12 years old (and, therefore, C.D. was 2 years younger than A.B.). C.D. herself started working on the farm a few years later in 2011, alongside Hogenson, when she was "14, maybe 15 years old." Hogenson testified that he told his trial attorney in advance of trial that A.B.'s purported statement to police that he was working at the farm before late fall 2008 was inaccurate. Further, Hogenson testified that he was not living with his parents in Fennimore before he started to work on the nearby farm, but was instead living in another town.

¶42 The circuit court made a determination that undermined the premise of this argument. The court concluded in pertinent part that A.B.'s and C.D.'s statements to police concerned when Hogenson started working on the farm (and

15

living nearby in Fennimore) in 2008, and they were unrelated to when C.D. began working at the farm in 2011. Thus, the court reasoned, there was nothing in A.B.'s interview statements to suggest, in light of C.D.'s postconviction testimony, that A.B. had turned 16 by the time the alleged assaults began. The court went on to consider whether the testimony of C.D. and her father nonetheless could have undermined the prosecution theory that the alleged assaults took place during the charged time period. In considering this issue, the court determined in pertinent part that Hogenson failed to sufficiently examine his trial counsel regarding the specifics, and for at least this reason failed to create a record from which it could be established that trial counsel performed deficiently in not pursuing a chronology-related argument.

*Analysis*

¶43    Aspects of Hogenson's chronology-related argument are unclear. But we understand him to argue that he is constitutionally entitled to a trial at which C.D. and her father testify, and defense counsel cross-examines A.B., regarding her statements to police about Hogenson's living and working arrangements during the period over which the assaults occurred, because this would provide a viable defense that she was 16 when the assaults started. The argument is that, with that evidence, Hogenson could persuade a jury of the following: C.D. was two years younger than Hogenson; the assaults took place during the time when C.D. was actively working on the farm while Hogenson was working there and living in Fennimore, *i.e.*, no earlier than the summer or fall of 2011, when C.D. was 14 or 15, making A.B. 16 or older; and A.B. was not accurate in her chronology that places the assaults at a time earlier than 2011. Assuming that the circuit court would have allowed the prosecution to amend the criminal complaint to charge misdemeanors rather than the criminal information

charging a felony, the prejudice to Hogenson was that he was deprived of the chance to be found guilty of a misdemeanor instead of a felony. We reject this argument because it depends on misinterpretations of various aspects of the record.

¶44    One significant problem with Hogenson's argument is that A.B.'s statements to police were not precise as to when the sexual assaults occurred in relation to where Hogenson was living and working. When police asked A.B. about Hogenson's living and working arrangements, the question was framed ambiguously as "at the time." Similarly, when police asked about Hogenson's contact with other young girls, the question was framed as "during that time." Moreover, as determined by the circuit court, A.B. did not indicate that she knew whether C.D. was actively working on the farm during the time that she understood that Hogenson was working there.

¶45    Thus, contrary to Hogenson's current argument, it is not clear from questions and answers reflected in the report of A.B.'s interview that she equated the entire period of alleged assaults with the entire time that C.D. and Hogenson worked together on the farm beginning in 2011. A.B.'s statements on these topics could easily be understood as her memory of Hogenson's most recent whereabouts at the approximate end of the period of assaults, the fall of 2008. This is approximately the same time period in which C.D. and her father stated that Hogenson began working at the farm. At a minimum, it is unclear how inaccurate A.B. would have been, compared with the testimony from C.D. and Hogenson, regarding the timing of Hogenson's work and living arrangements.

¶46    Moreover, so far as Hogenson shows, his working and living arrangements during the charged time period were not a significant aspect of

A.B.'s testimony or the prosecution's theory of guilt. Rather, A.B. testified clearly about the timing of the numerous alleged assaults in relation to her firsthand experiences: her personal experience of her school semesters and summer breaks, including the milestone of starting high school. Further, this aspect of her trial testimony was consistent with her statements to police. The clarity of A.B.'s testimony regarding the pertinent chronology in reference to her life events sharply contrasts to what, so far as the record shows, was in general her merely secondhand knowledge of Hogenson's life outside of her direct personal contacts with him. There is no evidence that A.B. ever went to see where Hogenson worked or knew about this information other than through what Hogenson or others told her. Instead, A.B. told police that she and Hogenson would talk on the phone "probably a couple times a week" and that one topic of conversation was "his farming job and what he did."

¶47 Expanding on this last, to the extent that A.B.'s testimony could have been undermined regarding the chronology, including the timing of Hogenson's work, Hogenson fails to show that there was a meaningful probability that the jury would have drawn exculpatory inferences. One premise of Hogenson's current argument is that he can show a meaningful probability that the jury could have made the following inferences based on the evidence offered at the postconviction hearing: nearly 13 years later, A.B. was correct about when Hogenson worked on the farm relative to the alleged timing of assaults, but she was mistaken about when the assaults took place relative to her detailed descriptions of events, including her meeting Hogenson and the first instance of sexual intercourse. Only then, so far as Hogenson argues the point, could the jury have concluded that the alleged assaults took place after A.B. turned 16. When

18

taking the record as a whole, Hogenson does not meet his burden to show that such an inference would have been sufficiently probable.

## II. Right to Assert Innocence

¶48    There is no dispute that Hogenson, in the words of the U.S. Supreme Court's decision in *McCoy*, "expressly assert[ed]" to his trial counsel that the objective of his defense was to assert innocence. *See McCoy*, 584 U.S. at 423. Moreover, there is no dispute that Hogenson asserted to his counsel that he did not have sex with A.B. at any point.  With those points in mind, Hogenson argues that his trial counsel's defense strategy, in particular the closing argument, constituted a "refus[al] to present … Hogenson's claim of innocence," which violated Hogenson's rights under the Sixth Amendment as articulated by the U.S. Supreme Court in *McCoy*.  Hogenson contends that this is so because his trial counsel in essence limited his jury argument to the proposition that the prosecution did not meet its burden to prove guilt beyond a reasonable doubt and did not affirmatively assert that A.B. fabricated her allegations.  We agree with the State that, under case law applying pertinent Sixth Amendment principles, Hogenson fails to establish his *McCoy*-based claim.

¶49    Under the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defen[s]e."  In providing this "assistance," trial counsel "makes the decisions regarding trial management," which generally includes "'what arguments to pursue.'" *State v. Chambers*, 2021 WI 13, ¶15, 395 Wis. 2d 770, 955 N.W.2d 144 (quoting *McCoy*, 584 U.S. at 422).  However, the Sixth Amendment "reserve[s]" "some decisions" for the defendant—"'notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf,

and forgo appeal.'" *Id.* (quoting *McCoy*, 584 U.S. at 422). In *McCoy*, the U.S. Supreme Court held that "'[a]utonomy to decide that the objective of the defense is to assert innocence' belongs in the category of decisions reserved for the defendant alone." *Chambers*, 395 Wis. 2d 770, ¶18 (quoting *McCoy*, 584 U.S. at 422) (alteration in *Chambers*). "A lawyer violates that autonomy '[w]hen a client expressly asserts that the objective'" of the client's defense is to "'maintain innocence of the charged criminal acts' and the lawyer acts contrary to that objective.'" *Id.* (quoting *McCoy*, 584 U.S. at 423) (alteration in *Chambers*). In sum, "to succeed on a *McCoy* claim," the defendant must show that the defendant "'expressly assert[ed] that the objective of [the defendant's] defen[s]e is to maintain innocence of the charged criminal acts' and the lawyer did not 'abide by that objective and [overrode] it by conceding guilt.'" *Id.*, ¶20 (quoting *McCoy*, 584 U.S. at 423) (emphasis omitted; first and fourth alterations in *Chambers*).

¶50     In *Chambers*, our supreme court rejected the defendant's argument that trial counsel conceded guilt in closing argument by asking the jury to "consider" a lesser included offense. *See id.*, ¶¶23-24. This was primarily because counsel's statement about lesser included offenses, when viewed in the context of the entire closing argument, did not concede her client's guilt. *Id.*, ¶24. Among the points that our supreme court counted as the assertion of innocence was counsel's argument to the jury that, despite there being some evidence of guilt, the prosecution failed to meet its burden to prove guilt beyond a reasonable doubt. *See id.*

¶51     Here, Hogenson rests his argument on two statements by his trial counsel during closing argument. As paraphrased by Hogenson, these statements were the following: "the question" for the jury to answer in reaching a verdict was "not whether [A.B.] is to be believed"; and counsel "personally [did] not know

whether the assaults happened." This argument fails largely because these paraphrases omit important context from the remainder of counsel's closing argument that demonstrates that both statements were part of a larger argument asserting Hogenson's innocence by way of contending that the prosecution had not established guilt beyond a reasonable doubt. *See id.*, ¶24 (evaluating closing argument in its entirety). We now explain in more detail.

¶52 Regarding counsel's statement to the jury that the main issue at trial was not whether to believe A.B., this was merely part of an explicit request that the jury assess A.B.'s credibility according to the jury instructions. *See* WIS JI—CRIMINAL 300 (instructing jurors to evaluate witness credibility based on factors including the witness' demeanor, "lack of clearness of the witness' recollection," and their "[p]ossible motives for falsifying testimony"). This complemented counsel's challenges to A.B.'s credibility based on, for example, arguing that her demeanor suggested that the jury could not consider her testimony sufficient to convict.

¶53 As to counsel's statement that he did not personally know whether Hogenson assaulted A.B., counsel explicitly framed this as a rejoinder to what counsel characterized as the prosecutor's assertion to the jury that the prosecutor personally knew that the assaults happened.[4] Counsel's argument would have

---

[4] Although Hogenson does not make it clear in his briefing, we understand him to be referring to the following statement by defense counsel during closing argument:

> [The prosecutor] did say: "and it[, meaning the sexual assaults,] did happen." Guess what? He doesn't know. I don't know. And you don't know. He used that phrase: "and it did happen." Well, that's the question. What's the ["]it["] and what happened[?]

21

been reasonably processed by the jury as a commonsense critique of the suggestion that the prosecutor could have personal knowledge and as a reminder that the jury was required to make its finding based on the evidence alone. Further, putting aside the prosecutor's statement, defense counsel's statement was made in the larger context of an argument that the evidence presented by the prosecution was insufficient to convict. This included what counsel contended was an incomplete investigation of whether aspects of A.B.'s testimony could be corroborated regarding alleged events from approximately 13 years before trial. Taken as a whole, trial counsel's focus on the prosecution's ability to meet its burden did not disregard or override Hogenson's objective to claim innocence by conceding guilt, much as occurred in *Chambers*.

¶54 What remains of Hogenson's argument on this issue rehashes his disagreement with trial counsel's strategy related to the traffic stop evidence and additional material that might have undermined A.B.'s testimony, which we have already discussed. That is, Hogenson now asserts that counsel was required to advance his claim of innocence by being more explicit in contending that A.B. fabricated the allegations. As we have noted, however, for purposes of *McCoy*, counsel's decision not to take that route was strategic and belonged to counsel alone. *See id.*, ¶15.

## III. Jury Instructions

¶55 Hogenson argues that the circuit court erred in crafting its instruction to the jury in response to a question sent out by the jury during deliberations. The jury's question was short: "Was [A.B.]'s initial report of sexual assault filed before or after the traffic stop?" The court instructed the jury as follows:

> The answers to your question are contained within the record of the testimony at the trial. You should rely on your collective memory of the evidence in ascertaining the answer to that question if you seek that answer.
>
> However, in respect to that factual issue, I want to instruct you that neither party in this case asserts that [A.B.] fabricated the allegations of sexual assault in response to [the boyfriend]'s speeding ticket. Nor do they assert that [the boyfriend] somehow thereafter subjected [A.B.] to any improper influence to create a false allegation of sexual assault. Disregard any suggestion that [A.B.'s] allegations are connected to the speeding ticket stop.

Hogenson argues that the second paragraph of this instruction "invaded the province of the jury to act as the factfinder" by determining "which evidence was relevant and material." We conclude that the court properly exercised its discretion in crafting this instruction under the particular circumstances here.[5]

¶56 The parties agree that the circuit court's decision regarding how to respond to the jury's question here constituted the creation of a jury instruction. *See* WIS. STAT. § 805.13(5) ("After the jury retires, the court may reinstruct the jury as to all or any part of the instructions previously given, or may give supplementary instructions as it deems appropriate.").

¶57 "A circuit court has broad discretion in issuing jury instructions based on the facts and circumstances of the case." *State v. Neumann*, 2013 WI 58, ¶89, 348 Wis. 2d 455, 832 N.W.2d 560. "A circuit court must, however, 'exercise its discretion in order to fully and fairly inform the jury of the rules of law applicable to the case and to assist the jury in making a reasonable analysis of the evidence.'" *Id.* (quoted source omitted). "[W]e analyze the [court's]

---

[5] Accordingly, we do not reach Hogenson's argument that the purported error was not harmless.

instructions as a whole to determine their accuracy, viewing them in the context of the overall charge," and do not review any "particular instruction in isolation." *See State v. McKellips*, 2016 WI 51, ¶30, 369 Wis. 2d 437, 881 N.W.2d 258.

¶58    "[A circuit] court cannot pass judgment on either the motives or the veracity of a witness in open court. These are matters for the jury, the trier of fact." *Murray v. State*, 83 Wis. 2d 621, 627, 266 N.W.2d 288 (1978); *see also State v. Vinson*, 183 Wis. 2d 297, 302, 515 N.W.2d 314 (Ct. App. 1994) (the rule "that it is improper for one witness to comment on the credibility of another witness's testimony … should apply even more forcefully to judges"). In *Murray*, it was error for the circuit court to allow the jury to inadvertently hear about the court's transcribed, in-chambers comment that a key witness was apparently motivated to alter the witness's testimony to protect the defendant as a friend. *See id.* at 625-28 (concluding that the error was not harmless, but rejecting defense argument based on failure to preserve it in circuit court).

*Additional Background*

¶59    Earlier on in the trial and outside the presence of the jury, the parties and the circuit court discussed the possible interaction between the traffic-stop evidence (which, as referenced above, could have provided a basis for Hogenson to argue that friction between the boyfriend and Hogenson caused or contributed to A.B. fabricating the allegations) and the prosecution's interest in presenting A.B.'s prior consistent statements about the sexual assaults (which, as we have explained, had to be triggered by a claim of recent fabrication or improper influence). Specifically, they discussed Hogenson's position that, at least to that point in the trial, the defense had not "opened the door" to allow the prosecution to introduce the inculpatory prior consistent statements. During this discussion, the

circuit court raised the possibility of giving a jury instruction explaining that the defense was *not* pursuing, and would disavow: the theory that A.B. fabricated her allegations or was unduly influenced by events arising from or surrounding the traffic stop. Defense counsel told the court that he was willing to make such a disavowal explicit in his closing argument, making the special instruction unnecessary. At this point, the court ruled that it would preclude the prosecution from offering the prior consistent statements. The court further explained that it would instruct the jury on the topic if, but only if, the closing argument of either side raised the "specter of the interplay of the traffic stop with the timing of" A.B.'s reporting the sexual assaults to police.

¶60 In their closing arguments, both the prosecutor and defense counsel told the jury that the defense was not arguing that A.B. fabricated assault allegations as a result of the events surrounding the traffic stop. Despite this, as noted, the jury sent out the short question quoted *supra*, ¶55.

¶61 Outside the jury's presence, the circuit court observed that the jury's question could be seen as "a realization of the [c]ourt's worst fears about what the jury would do with the lack of evidence," namely, the lack of testimony by A.B. regarding the timing and nature of her statements to various persons about the assaults before reporting them to police. The court further said that, "if nothing else," the jury's question "supports the idea that the parties successfully deemphasized that issue," because the jury appeared not to fully understand the chronology that included A.B.'s reporting of the allegations to police.

¶62 The circuit court shared with the parties its tentative plan for how to respond to the jury question: "Given the manner in which the case was presented," the court would instruct the jury to rely on its collective memory to

25

recall facts in evidence, but also planned to add the language quoted above, *supra* ¶55.

¶63  Defense counsel objected, taking the position that the circuit court should instruct the jury only that jurors "are to rely upon their recollection of the evidence as admitted." Counsel argued that the court saying more than that would not assist the jury and "may further confuse the issue." The court responded in part that failing to more fully instruct the jury regarding the issue they raised would permit the jury to decide the case other than how it was "very expressly" and "explicitly" tried, leaving only other issues to be contested. Failing to give a more full instruction would, in the court's view, have the effect of permitting the jury "to decide a different case than was tried." The court described the decision of the defense to explicitly disavow the recent fabrication theory arising from the traffic stop as "very consequential," and that it dictated how both sides tried the case. Therefore, the court reasoned, it would be "unjust" not to more fully instruct the jury.

¶64  While maintaining his objection to the circuit court's proposed instruction, defense counsel argued that if the court gave it, the court should also answer the specific factual question posed by the jury: "Was [A.B.]'s initial report of sexual assault filed before or after the traffic stop?" Counsel noted that the timing of A.B.'s first report to police relative to the traffic stop (a few weeks later) was a fact in evidence. Counsel argued that failing to answer the question directly, and instead "steer[ing] their thinking" on the topic, would "invad[e] the province of the jury." The court expressed a concern that, if the court attempted to provide facts to the jury, referencing individual pieces of evidence in the record—such as the timing of the report relative to the traffic stop—it would inadvertently emphasize those pieces of evidence to the exclusion of other evidence bearing on

that topic, such as that A.B. had told the boyfriend about the sexual assaults before the traffic stop. Defense counsel acknowledged that referencing certain facts in an instruction could create "a slippery slope." Counsel then circled back to the position that the court should instruct the jury only to rely on its collective memory. The defense also argued more generally that the court's proposed instruction would "interfere" with the ability of the jury to assess A.B.'s credibility.

¶65 The prosecutor at times took the position that the circuit court should instruct the jury to "rely on their collective memory" of the trial evidence, without referencing specific evidence. However, the prosecutor at other times appeared to express support for the court instructing the jury more fully on the topic of when A.B. made her initial report to police.

¶66 After receiving the instruction quoted above, the jury reached a guilty verdict without asking the circuit court another question.

*Analysis*

¶67 The circuit court did not erroneously exercise its discretion in crafting the instruction that it gave under the particular circumstances that arose here. The court scrupulously reflected the positions that were consistently and explicitly taken by the parties throughout trial on the connection (or the lack thereof) between the traffic stop and the potential admission of A.B.'s prior consistent statements. Hogenson's disavowal of a recent fabrication theory was taken with the specific intent of avoiding the admission of prior consistent statements. The instruction was consistent with the court's ruling on the prior consistent statements and conformed to the pertinent language in Wɪs. Sᴛᴀᴛ.

27

§ 908.01(4)(a) by addressing whether A.B. "fabricated" her allegations or the boyfriend "subjected [A.B.] to any improper influence" based on the traffic stop.

¶68     In effect, the circuit court gave the jury a cautionary instruction on evidence relating to the traffic stop.  It directed the jury to ignore uses of that evidence that Hogenson's defense explicitly disavowed, as part of defense counsel's reasonable and important strategic choice.  *See* WIS. STAT. § 901.06 ("When evidence which is admissible … for one purpose but not admissible … for another purpose is admitted, the judge, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.").  Hogenson does not argue that the instruction at issue was not tailored to the facts of the case as tried by the parties.  As the court transparently explained to the parties at the time, it was tailored to the way the case was tried by the parties.

¶69     We conclude that the circuit court made a reasonable determination that this instruction was necessary to exclude evidentiary inferences whose probative value was substantially outweighed by the danger of confusion over the issues presented at trial.  *See* WIS. STAT. § 904.03.  A.B. was not asked at trial if the traffic stop motivated or influenced her testimony.  The court's logic, which we conclude was reasonable, was that the jury was not in a position to fairly assess whether the traffic stop could have improperly influenced A.B. without also being able to assess prior consistent statements to which the jury did not have access.

¶70     Hogenson asserts that it was improper for the circuit court to attempt to "turn[] the jury's focus … to matters" that the court considered "in actual dispute," but he generally fails to support this proposition.  Hogenson contends that the instruction was "a legal ruling on an issue of fact," namely "the credibility and motivations" of A.B. as a witness.  It is true that the instruction dealt with the

possible inference of whether A.B.'s allegations were specifically motivated or unduly influenced by the events surrounding the traffic stop, and that this related to her overall credibility as a witness. However, the instruction did not direct the jury to find that A.B.'s testimony was credible in any respect. Thus, the jury was not precluded from determining whether A.B. was incredible or motivated to fabricate in general, such as could have occurred if the court had improperly supplied *its own* view of her credibility or motivations. *Cf. Murray*, 83 Wis. 2d at 626 (circuit court, through in-chambers remarks inadvertently given to jury, "offered its own explanation for" a witness' "differing stories and hesitation"). Put differently, the instruction did not comment on any aspect of A.B.'s motivations that was placed at issue by the parties at trial. This distinguishes Hogenson's attempt to rely on, by analogy, case law involving a witness improperly vouching for the credibility of another witness. *See State v. Haseltine*, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984) (expert testimony stating opinion that witness was a victim of incest was effectively an opinion that the witness was telling the truth about incest allegations); *Vinson*, 183 Wis. 2d at 302.

¶71 It further undermines Hogenson's argument that the circuit court instructed the jury regarding witness credibility in a way that reinforced the concept that the jury was the exclusive judge of the credibility of witnesses and the weight of their testimony. The court instructed jurors before the opening of the evidence phase of the trial that they were "the judges of the credibility of the witnesses and the weight of the evidence." Similarly, after the close of evidence, the court instructed the jurors regarding the weighing of credibility in pertinent part as follows:

> In determining the credibility of each witness and the weight you give to the testimony of each witness consider these factors. Whether the witness has an interest

or lack of interest in the result of this trial. The witness' conduct, appearance, and demeanor on the witness stand. The clearness or lack of clearness of the witness' recollection. The opportunity the witness had for observing and for knowing the matters the witness testified about. The reasonableness of the witness' testimony. The apparent intelligence of the witness. Bias or prejudice, if any has been shown. Possible motives for falsifying testimony. And all other facts and circumstances during the trial which tend either to support or to discredit the testimony. Then give to the testimony of each witness the weight you believe it should receive.

*See* WIS JI—CRIMINAL 300. It is true that these standard instructions address witness credibility and motivations at the general level. But they could be readily and properly applied to the specific challenged instruction here, including its first portion: "The answers to your question are contained within the record of the testimony at the trial. You should rely on your collective memory of the evidence in ascertaining the answer to that question if you seek that answer."

## CONCLUSION

¶72 For all of these reasons, we affirm the judgment of conviction and the circuit court's denial of Hogenson's postconviction motion for a new trial.

*By the Court*.—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.